Docket No. 99421.

# IN THE
# SUPREME COURT
# OF
# THE STATE OF ILLINOIS

JOANN MELENA, Appellee, v. ANHEUSER-BUSCH, INC.,
Appellant.

*Opinion filed March 23, 2006.*

JUSTICE FREEMAN delivered the judgment of the court, with opinion.

Chief Justice Thomas and Justices McMorrow, Fitzgerald, Garman, and Karmeier concurred in the judgment and opinion.

Justice Kilbride dissented.

## OPINION

This case arises from a complaint filed by plaintiff, Joann Melena, alleging that her employer, defendant Anheuser-Busch, Inc., terminated her employment in retaliation for her filing of a workers' compensation claim with the Illinois Industrial Commission. The circuit court of Jefferson County denied Anheuser-Busch's motion to dismiss and compel arbitration or, in the alternative, to stay the proceedings and compel arbitration. The appellate court affirmed the circuit court's order and remanded the matter for further proceedings. 352 Ill. App. 3d 699. We granted leave to appeal (177 Ill. 2d. R. 315) and now reverse the judgment of the appellate court.

## BACKGROUND

Plaintiff joined Anheuser-Busch as a nonunion employee at its distribution center in Mt. Vernon, Illinois, on February 22, 1999. In February 2000, Anheuser-Busch mailed to all of its Mt. Vernon employees, including plaintiff, a letter which announced the impending implementation of a "Dispute Resolution Program." Attached to the letter were materials describing the new program, including a "Dispute Resolution Program Guide," "Dispute Resolution Program Highlights," and the "Dispute Resolution Program Policy Statement."

The various materials explained the new program. For example, the policy statement set forth:

"This procedure is an agreement to arbitrate pursuant to the Federal Arbitration Act, 9 U.S.C.A. Sections 1-14, or if that Act is held to be inapplicable for any reason, the arbitration law in the state in which the arbitration hearing is held."

The concept of binding arbitration was described in the following manner:

"At the binding arbitration level, disputes that cannot be resolved through Level 1 *** or Level 2 *** are presented to a neutral third-party arbitrator for a final and binding decision. The arbitrator essentially substitutes for a judge and jury who might decide the case in a court setting. At the arbitration hearing, the arbitrator makes a decision after both sides have presented their positions. If the arbitrator decides in favor of the employee, the arbitrator can award the same remedies that would have been available in court for the type of claim that was brought."

The policy statement further explained that "by continuing or accepting an offer of employment" with Anheuser-Busch, all employees to whom the policy was applicable "agree as a condition of employment to submit all covered claims to the dispute resolution program." The statement defined "covered claims" as "employment-related claims against the company and individual managers acting within the scope of their employment, regarding termination and/or alleged unlawful or illegal conduct on the part of the company ***." Moreover, the policy made clear that the new procedure did not operate "to change the employment-at-will relationship between the company and its employees."

˘2˘

In addition to the written materials included in the letter, Anheuser-Busch arranged for a brief presentation of the new program to be delivered to Mt. Vernon employees on February 23, 2000, which was to be followed by a question-and-answer session. Anheuser-Busch also placed posters explaining the program throughout its Mt. Vernon facility. The new program became effective on April 1, 2000.

In April 2001, Anheuser-Busch distributed "The Promotional Products Group [PPG] Distribution Center Handbook" to Mt. Vernon employees. This handbook included a description of the dispute resolution program and referenced the written program materials noted above. On April 27, 2001, plaintiff signed the following "Employee Acknowledgment and Understanding":

> "I acknowledge that I have received the PPG Mt. Vernon employee handbook. I understand that the information in the handbook represents guidelines only and that the company reserves the right to modify this handbook or amend or terminate any policies, procedures, or employee benefit programs at any time, whether or not described in this handbook. I understand that I am responsible for reading the handbook, familiarizing myself with its contents and adhering to all company policies and procedures, whether set forth in this handbook or elsewhere.
>
> I further understand and acknowledge that this handbook is not a contract of employment or guarantee of employment for any specific duration, express or implied, between me and PPG Mt. Vernon."

On September 11, 2002, plaintiff suffered a work-related injury for which she filed a claim for workers' compensation with the Illinois Industrial Commission. While plaintiff was receiving temporary total disability benefits, Anheuser-Busch terminated her employment on March 14, 2003.

Plaintiff filed a complaint in the circuit court of Jefferson County on May 8, 2003. In the complaint, she alleged that Anheuser-Busch discharged her in retaliation for exercising her rights under the Illinois Workers' Compensation Act. Anheuser-Busch moved to dismiss the complaint and compel arbitration or, in the alternative, to stay the proceedings and compel arbitration. The circuit court denied

the motion without comment.

On appeal, the appellate court affirmed the circuit court's order. The appellate court held that, in order to be enforceable, an agreement to arbitrate claims like the one at issue must be entered into knowingly and voluntarily. After considering the facts of this case, the appellate court concluded that a remand was not necessary because "even if the plaintiff entered into the agreement knowingly, she did not do so voluntarily." 352 Ill. App. 3d at 707. Noting that it had "serious reservations" about whether an agreement to arbitrate, offered as a condition of employment, "is ever voluntary," the court deemed "illusory" whatever choice plaintiff was said to have had in this matter. 352 Ill. App. 3d at 707-08. The court remanded the cause to the circuit court for further proceedings on the underlying cause for retaliatory discharge.

ANALYSIS

The issue presented in this case is whether the mandatory arbitration provisions of the "Dispute Resolution Program" instituted by Anheuser-Busch constitute an enforceable contract binding on plaintiff. Anheuser-Busch assigns error to the appellate court's holding that the arbitration agreement, to be enforceable, must be entered into knowingly and voluntarily. Rather, Anheuser-Busch contends that, like any other contract, an arbitration agreement is enforceable, based on fundamental principles of contract law. Plaintiff, urging affirmance of the appellate court, contends that the arbitration agreement was not enforceable because she did not enter into the contract knowingly and voluntarily.[1]

---

[1]We have allowed several *amici curiae* to file briefs in this matter: Ralph's Grocery Company in support of Anheuser-Busch, and the National Employment Lawyers Association, American Association of Retired Persons, and National Employment Lawyers/Illinois, the Illinois Trial Lawyers Association, and Professor David Schwartz in support of plaintiff.

Anheuser-Busch filed its motion to dismiss and compel arbitration or, in the alternative, to stay the proceedings and compel arbitration, pursuant to section 2–619 of the Code of Civil Procedure. (735 ILCS 5/2–619 (West 2000)). In ruling on such a motion, the court must interpret all pleadings and supporting documents in the light most favorable to the nonmoving party. *Borowiec v. Gateway 2000, Inc*., 209 Ill. 2d 376, 383 (2004), citing *In re Chicago Flood Litigation*, 176 Ill. 2d 179, 189 (1997). The standard of review on appeal is *de novo*. *Borowiec*, 209 Ill. 2d at 383.

The parties do not dispute that resolution of this case concerns the application of the Federal Arbitration Act (FAA) (9 U.S.C. §1 *et seq.* (1994)). In construing a federal statute, we generally look to federal decisions for its interpretation of the statutory provisions. *U.S. Bank National Ass'n v. Clark*, 216 Ill. 2d 334, 352 (2005); *Wilson v. Norfolk & Western Ry. Co.*, 187 Ill. 2d 369, 383 (1999). This court, in *Borowiec v. Gateway 2000, Inc*., 209 Ill. 2d 376 (2004), discussed the history and purpose of the FAA, acknowledging that in enacting the FAA, Congress sought " 'to reverse the longstanding judicial hostility to arbitration agreements that had existed at English common law and had been adopted by American courts, and to place arbitration agreements upon the same footing as other contracts.' " *Borowiec*, 209 Ill. 2d at 384, quoting *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 24, 114 L. Ed. 2d 26, 36, 111 S. Ct. 1647, 1651 (1991). Section 2 of the FAA compels judicial enforcement of arbitration agreements "in any *** contract evidencing a transaction involving commerce." 9 U.S.C. §2 (1994). The United States Supreme Court has held that employment contracts are subject to the terms of the FAA except for those employment contracts which deal with transportation workers. *Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 149 L. Ed. 2d 234, 121 S. Ct. 1302 (2001). Section 2 further provides that such a written provision

> "shall be valid, irrevocable, and enforceable, *save upon such grounds as exist at law or in equity for the revocation of any contract*." (Emphasis added.) 9 U.S.C. ç2 (1994).

Throughout its provisions, the FAA reflects a " 'liberal federal policy favoring arbitration agreements.' " *Borowiec,* 209 Ill. 2d at 384, quoting *Moses H. Cone Memorial Hospital v. Mercury Construction Corp.*, 460 U.S. 1, 24, 74 L. Ed. 2d 765, 785, 103 S. Ct. 927, 941

(1983).

The parties disagree over whether the *choice* of litigating a claim for retaliatory discharge, based on statutory rights under the Illinois Workers' Compensation Act (820 ILCS 305/1 *et seq.* (West 2000)), in state court is an important right which may only be relinquished through a knowing and voluntary waiver. In this context, the parties, as well as the appellate court, have likened the claim at issue here, *i.e.*, retaliatory discharge based on statutory rights under the Workers' Compensation Act, to federal statutory claims such as those advanced under Title VII of the Civil Rights Act. In *Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 39 L. Ed. 2d 147, 94 S. Ct. 1011 (1974), the United States Supreme Court indicated that an employee could not *forfeit* substantive rights under Title VII without a voluntary and knowing waiver. In other words, before an employee gives up a substantive right predicated upon federal statutory law, it must be clear that the employee understands and freely makes the decision to do so. See *Pierce v. Atchinson, Topeka, & Santa Fe Ry. Co.*, 65 F.3d 562, 571 (7th Cir. 1995). However, as the Seventh Circuit Court of Appeals has noted, "[l]ess clear is whether the right to have one's federal claims determined judicially rather than in an arbitration proceeding qualifies to this added protection." *Gibson v. Neighborhood Health Clinics*, 121 F.3d 1126, 1129 (7th Cir. 1997).

The United States Supreme Court has not directly addressed this issue. Rather, since the decision in *Alexander*, the Court's views on arbitration have evolved and become more favorable. For example, the Court has repeatedly "rejected generalized attacks on arbitration that rest on 'suspicion of arbitration as a method of weakening the protections afforded in the substantive law.' " *Green Tree Financial Corp.-Ala v. Randolph*, 531 U.S. 79, 89-90, 148 L. Ed. 2d 373, 383, 121 S. Ct. 513, 521 (2000), quoting *Rodriguez de Quijas v. Shearson/American Express, Inc.*, 490 U.S. 477, 481, 104 L. Ed. 2d 526, 535-36, 109 S. Ct. 1917, 1920 (1989). The Court has emphasized that "federal statutory claims may be the subject of arbitration agreements *** enforceable pursuant to the FAA because the agreement only determines the choice of forum." *Equal Employment Opportunity Comm'n v. Waffle House, Inc.*, 534 U.S. 279, 295 n.10, 151 L. Ed. 2d 755, 770 n.10, 122 S. Ct. 754, 765 n.10 (2002). According to the Court, "[b]y agreeing to arbitrate a statutory claim, a party does not forgo the substantive rights afforded by the

statute; it only submits their resolution in an arbitral, rather than a judicial, forum." *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 628, 87 L. Ed. 2d 444, 456, 105 S. Ct. 3346, 3354 (1985).

The Supreme Court has held, however, that statutory rights may be subject to mandatory arbitration only if the arbitral forum permits the effective vindication of those rights:

> "It is by now clear that statutory claims may be the subject of an arbitration agreement, enforceable pursuant to the FAA. Indeed, in recent years we have held enforceable arbitration agreements relating to claims arising under the Sherman Act [citation], §10(b) of the Securities Exchange Act of 1934 [citation], the civil provisions of the Racketeer Influenced and Corrupt Organizations Act (RICO) [citation], and §12(2) of the Securities Act of 1933 [citation]. See *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614 (1985); *Shearson/American Express Inc. v. McMahon*, 482 U.S. 220 (1987); *Rodriguez de Quijas v. Shearson/American Express, Inc.*, 490 U.S. 477 (1989). In these cases we recognized that '[b]y agreeing to arbitrate a statutory claim, a party does not forgo the substantive rights afforded by the statute; it only submits to their resolution in an arbitral, rather than a judicial, forum.' " *Gilmer*, 500 U.S. at 26, 114 L. Ed. 2d at 37, 111 S. Ct. at 1652, quoting *Mitsubishi*, 473 U.S. at 628, 87 L. Ed. 2d at 456, 105 S. Ct. at 3354.

The Court has further instructed that, in order to be valid, the agreement to arbitrate statutory claims must be clear and unmistakable. See *Wright v. Universal Maritime Service Corp.*, 525 U.S. 70, 142 L. Ed. 2d 361, 119 S. Ct. 391 (1998) (holding arbitration agreement, contained within a union collective-bargaining agreement, invalid because the clause in question was too general in stating that "matters under dispute" would be subject to arbitration). The "clear and unmistakable" standard relates more to the language of the

agreement than to the state of mind of the employee.[2]

Although the Supreme Court has not spoken on the need for a knowing and voluntary standard in this context, several federal circuit courts of appeal have weighed in on the matter. As noted by the appellate court in this case, a split exists amongst the various circuits regarding the knowing and voluntary standard. 352 Ill. App. 3d at 705. The appellate court found persuasive the reasoning espoused by the Ninth Circuit Court of Appeals in *Prudential Insurance Co. of America v. Lai*, 42 F.3d 1299 (9th Cir. 1994). There, the Ninth Circuit reversed a district court order compelling arbitration on a sexual discrimination claim because the employees had not knowingly entered into the agreement to arbitrate employment disputes. The employees, when applying for the positions of sales representatives with the employer, were required to sign forms containing agreements to arbitrate any dispute, claim or controversy required to be arbitrated under the rules of any organization with which the employees registered. They subsequently registered with the National Association of Securities Dealers, which required that disputes arising in connection with the business of its members be arbitrated. The employees contended that when they signed the forms, arbitration was never mentioned and they were never given a copy of the NASD Manual, which contained the actual terms of the arbitration agreement. *Lai*, 42 F.3d at 1301.

In considering the enforceability of the arbitration agreement, the court of appeals framed the issue thusly: "The issue before us, however, is not whether employees may ever agree to arbitrate statutory employment claims; they can. The issue here is whether these particular employees entered into such a binding arbitration

---

[2]This case does not present us with a question regarding a clear and unmistakable waiver with respect to the contract language. The Dispute Resolution Policy sets forth a complete list of what is covered by it, including "retaliation claims for legally protected activity and/or whistleblowing."

agreement, thereby waiving statutory court remedies otherwise available." *Lai*, 42 F.3d at 1303. The court recognized that certain causes of action are entitled to a heightened level of protection pursuant to various federal statutes, such as the Age Discrimination Employment Act, the Civil Rights Act or the Americans with Disabilities Act. It noted that, " 'Legislative enactments in this area have long evinced a general intent to accord parallel or overlapping remedies against discrimination. In the Civil Rights Act of 1964, Congress indicated that they considered the policy against discrimination to be of the 'highest priority.' \*\*\* Moreover, the legislative history of Title VII manifests a congressional intent to allow an individual to pursue independently his rights under both Title VII and other applicable state and federal statutes.' " *Lai*, 42 F.3d at 1304, quoting *Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 47-48, 39 L. Ed. 2d 147, 158, 94 S. Ct. 1011, 1019 (1974). The court held that the employees were not bound by any valid agreement to arbitrate the disputes because they did not *knowingly* enter into a contract to forgo their statutory remedies in favor of arbitration.

The court further cited specific provisions of legislative history to support its adoption of the "knowing and voluntary" standard. H.R. Rep. No. 102–40(I), at 97 (1991), *reprinted in* 1991 U.S.C.C.A.N. 549, 635. Speaking of proposed section 118, Senator Dole explicitly declared that the arbitration provision encourages arbitration only "where the parties knowingly and voluntarily elect to use these methods." 137 Cong. Rec. S15472, S15478 (daily ed. October 30, 1991) (statement of Senator Dole). The knowing and voluntary standard enunciated in *Lai* has been adopted by other courts, as well. See, *e.g.*, *Rosenberg v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 170 F.3d 1 (1st Cir. 1999).

As the appellate court noted, however, the Ninth Circuit's approach to this issue has not "garnered universal support." 352 Ill. App. 3d at 705. A countervailing point of view to the knowing and voluntary standard is one which holds that the determination of the enforceability of a mandatory arbitration agreement between employer and employee turns upon fundamental principles of contract law. Under this approach,

> "The nondrafting party \*\*\* consents to arbitration by signing the form or by manifesting assent in another way, such as by

performance of the contract. That the consumer did not read or understand the arbitration clause does not prevent the consumer from consenting to it. Nor does the consumer's ignorance that an arbitration clause is included on the form. These are statements of ordinary, plain-vanilla contract law." S. Ware, *Arbitration Clauses, Jury-Waiver Clauses, and other Contractual Waivers of Constitutional Rights*, 67 Law & Contemp. Probs. 167, 171 (Winter/Spring 2004).

Several federal circuit courts of appeal have endorsed this approach, as exemplified by the decision of the United States Court of Appeals for the Third Circuit in *Seus v. John Nuveen & Co.*, 146 F.3d 175 (3d Cir. 1998).

In *Seus*, the court of appeals affirmed the district court's order granting the employer's motion to compel arbitration in a suit by an employee alleging multiple claims of discrimination under Title VII of the Civil Rights Act of 1964 and the Age in Discrimination in Employment Act of 1967. The employee joined Nuveen brokerage firm in 1982. Nuveen is required to register all employees who deal in securities with the National Association of Securities Dealers. In order to comply with this requirement, employees must sign a U-4 form in which the employee agrees to arbitrate any dispute which is required "to be arbitrated under the Rules." Although the employee in *Seus* executed this form, she contended that Congress, "in legislation subsequent to the FAA, has carved out an exception to its provisions for pre-dispute agreements to arbitrate claims under the ADEA." *Seus*, 146 F.3d at 179. The court, rejected this argument by citing *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 114 L. Ed. 2d 26, 111 S. Ct. 1647 (1991), stating:

> "The Supreme Court began its analysis by making it clear that exceptions to the FAA's rule requiring enforcement of agreements to arbitrate are not to be recognized lightly. Because of the strong federal policy favoring arbitration, any exception must be founded on clear indicia of congressional intent." *Seus*, 146 F.3d at 179.

Rejecting the "knowing and voluntary" standard, the court went on to hold:

> "By 'knowing' and 'voluntary', Seus means more than with an understanding that a binding agreement is being

entered and without fraud or duress. Determining whether an agreement to arbitrate is 'knowing' and 'voluntary', in her view, requires an inquiry into such matters as the specificity of the language of the agreement, the plaintiff's education and experience, plaintiff's opportunity for deliberation and negotiation, and whether plaintiff was encouraged to consult counsel. She does not contend that this heightened 'knowing and voluntary' standard is a generally applicable principle of contract law. \*\*\* Nothing short of a showing of fraud, duress, mistake or some other ground recognized by the law applicable to contracts generally would have excused the district court from enforcing Seus's agreement." *Seus*, 146 F.3d at 183-84.

Similarly, the Eleventh, Fifth, Eighth and District of Columbia Circuit Courts of Appeal have rejected the knowing and voluntary standard. See *Caley v. Gulfstream Aerospace Corp.*, 428 F.3d 1359 (11th Cir. 2005); *American Heritage Life Insurance Co. v. Orr*, 294 F.3d 702 (5th Cir. 2002); *Patterson v. Tenet Healthcare, Inc.*, 113 F.3d 832 (8th Cir. 1997); *Cole v. Burns International Security Services*, 105 F.3d 1465 (D.C. Cir. 1997).

After careful consideration, we agree with those federal circuit courts of appeal which base their analysis upon principles of fundamental contract law because we believe that approach is more faithful to the FAA. The Seventh Circuit Court of Appeals has recently questioned the "continued validity"of the Ninth Circuit's knowing and voluntary waiver standard in the wake of recent United States Supreme Court decisions, noting "it is clear that arbitration agreements in the employment context, like arbitration agreements in other contexts, are to be evaluated according to the same standards as any other contract." *Penn v. Ryan's Family Steak House, Inc.*, 269 F.3d 753, 758 (7th Cir. 2001). The Seventh Circuit also has recognized that

> "[w]hile the Supreme Court has stressed in recent years that federal policy under the FAA favors the enforcement of valid arbitration agreements [citations], the Court has been equally adamant that a party can be forced into arbitration only if she has in fact entered into a valid, enforceable contract waiving her right to a judicial forum. *AT&T*

*Technologies, Inc. v. Communications Workers of America*, 475 U.S. 643, 89 L. Ed. 2d 648, 106 S. Ct. 1415 (1986) ('[A]rbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit.') Whether the parties have agreed to arbitrate is determined under ordinary state law contract principles." *Penn*, 269 F.3d at 758-59.

In our view, the FAA's plain language makes clear that arbitration agreements are enforceable except for state-law grounds for ordinary contract revocation. 9 U.S.C. §2 (1994). See also *Perry v. Thomas*, 482 U.S. 483, 492 n.9, 96 L. Ed. 2d 426, 437 n.9, 107 S. Ct. 2520, 2527 n.9 (1987) (noting that section 2 allows state law to preclude enforcement of arbitration agreements where "that law arose to govern issues concerning the validity, revocability, and enforceability of contracts generally"). It is widely recognized that state statutes or court decisions cannot hold arbitration agreements to a standard any different or higher than those applicable to other contracts in general. See *Doctor's Associates, Inc. v. Casarotto*, 517 U.S. 681, 687, 134 L. Ed. 2d 902, 909, 116 S. Ct. 1652, 1656 (1996) ("Congress precluded States from singling out arbitration provisions for suspect status"). Similarly, the failure to apply general contract doctrines to arbitration agreements which require waiver of fundamental, statutory rights would raise arbitration agreements to an elevated status not contemplated by the FAA or Congress. "As the 'saving clause' in ç2 indicates, the purpose of Congress in 1925 was to make arbitration agreements as enforceable as other contracts, but not more so." *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 404 n.12, 18 L. Ed. 2d 1270, 1277 n.12, 87 S. Ct. 1801, 1806 n.12 (1967). We agree with the Eleventh Circuit Court of Appeals in that, by "knowing" and "voluntary," plaintiff means "much more than a general understanding that a binding agreement or contract is being entered into." *Caley*, 428 F.3d at 1370 n.12. Such an approach is contrary to the usual maxim of contract law that a party to an agreement is charged with knowledge of and assent to the agreement signed. *Black v. Wabash, St. Louis & Pacific Ry. Co.*, 111 Ill. 351, 358 (1884); *Hintz v. Lazarus*, 58 Ill. App. 3d 64, 66 (1978). For these reasons, we view the heightened "knowing and voluntary" standard as being inconsistent with the FAA.

Notwithstanding the above, plaintiff, citing *People v. Braggs*, 209 Ill. 2d 492 (2003), argues that before a constitutional right may be waived, it must be clear the waiver was entered into voluntarily and knowingly. In light of this, she argues, the arbitration agreement is ineffective to waive her seventh amendment and statutory trial rights, such as the right to access to the courts and the right to a jury trial. Similar arguments have been rejected by several federal circuit courts of appeal. In discussing this same issue, the Eleventh Circuit recently stated:

> "[A]s the Fifth Circuit has noted, '[t]he *Seventh Amendment* does not confer the right to a trial, but only the right to have a jury hear the case *once it is determined that the litigation should proceed before a court*. If the claims are properly before an arbitral forum pursuant to an arbitration agreement, the jury trial right vanishes.' *American Heritage Life Ins. Co. v. Orr*, 294 F.3d 702, 711 (5th Cir. 2002) (emphasis added); *see also Sydnor v. Conseco Fin. Serv. Corp.*, 252 F.3d 302, 307 (4th Cir. 2001) ('[t]he right to a jury trial attaches in the context of judicial proceedings *after it is determined that litigation should proceed before a court*. Thus, the loss of the right to a jury trial is a necessary and fairly obvious consequence of an agreement to arbitrate.' (quotation marks and citation omitted) (emphasis added)); *Koveleskie v. SBC Capital Mkts., Inc.*, 167 F.3d 361, 368 (7th Cir. 1999) ('[W]e are satisfied, as was the Court in *Gilmer*, that the arbitral forum adequately protects an employee's statutory rights, both substantively and procedurally.'); *Seus v. John Nuveen & Co.*, 146 F.3d 175, 183-84 (3d Cir. 1998) (holding that applying a heightened knowing-and-voluntary standard to arbitration agreements would be inconsistent with the FAA and *Gilme*r), *abrogated on other grounds*, *Blair v. Scott Specialty Gases*, 283 F.3d 595 (3d Cir. 2002). Thus, where a party enters into a valid agreement to arbitrate, the party is not entitled to a jury trial or to a judicial forum for covered disputes." (Emphasis added and in original.) *Caley*, 428 F.3d at 1371-72.

We find this reasoning persuasive and so hold.

Having concluded that the regular principles of contract law

apply in this case, we must now apply our state contract law in analyzing the contract question. In other words, we must now decide whether the parties' agreement to arbitrate amounted to an enforceable contract under Illinois law. We hold that it did.

In Illinois, an offer, an acceptance and consideration are the basic ingredients of a contract. *Steinberg v. Chicago Medical School*, 69 Ill. 2d 320, 329 (1977). We believe that Anheuser-Busch's introduction of the Dispute Resolution Program, its mailing of materials related to the program to its employees, constitutes Anheuser-Busch's "offer." By continuing her employment with Anheuser-Busch, plaintiff both accepted the offer and provided the necessary consideration. See *Duldulao v. Saint Mary of Nazareth Hospital Center*, 115 Ill. 2d 482, 490 (1987). As Anheuser-Busch correctly notes, under Illinois law, continued employment is sufficient consideration for the enforcement of employment agreements. See, *e.g.*, *Lawrence & Allen, Inc. v. Cambridge Human Resource Group, Inc.*, 292 Ill. App. 3d 131 (1997); *McRand, Inc. v. van Beelen*, 138 Ill. App. 3d 1045, 1055 (1985); see also *Woodfield Group, Inc. v. DeLisle*, 295 Ill. App. 3d 935, 942-43 (1998) (observing in passing that continued employment is sufficient consideration for the addition of a covenant not to compete in an employment contract). Plaintiff continued working for Anheuser-Busch for three years after the initial implementation of the Dispute Resolution Program in 2000 and for just shy of two years after signing the acknowledgment form in 2001. Under these facts, the agreement to arbitrate covered claims arising fro the employment relationship is enforceable.

In so holding, we necessarily reject the appellate court's implication that plaintiff's acceptance of the dispute resolution provisions in this case was illusory by virtue of the fact that Anheuser-Busch gave her little choice in the matter. 352 Ill. App. 3d at 707-08. In other words, because the agreement was offered on a "take it or leave it" basis, the contract is unenforceable. The appellate court's implication here contravenes federal, as well as Illinois, decisional law. The United States Supreme Court in *Gilmer* stated that inequality in bargaining power "is not a sufficient reason to hold that arbitration agreements are never enforceable in the employment context." *Gilmer*, 500 U.S. at 33, 114 L. Ed. 2d at 41, 111 S. Ct. at 1655. Various federal circuit courts of appeal have rejected any notion that such contracts are unconscionable or adhesive in nature.

The Seventh Circuit recently noted the futility surrounding an argument grounded in the doctrine of unconscionability:

> "Businesses regularly agree to arbitrate their disputes with each other; giving employees the same terms and forum (the AAA) that a firm deems satisfactory for commercial dispute resolution is not suspect. Employees fare well in arbitration with their employers–better by some standards than employees who litigate, as the lower total expenses of arbitration make it feasible to pursue smaller grievances and leave more available for compensatory awards. See Theodore Eisenberg & Elizabeth Hill, *Employment Arbitration and Litigation: An Empirical Comparison*, 58 Dispute Resolution J. 44 (2003-04)." *Oblix, Inc. v. Winiecki*, 374 F.3d 488, 491 (7th Cir. 2004).

See also *Seus*, 146 F.3d at 184 (rejecting argument that agreement was a contract of adhesion due to disparity in bargaining power); *Rosenberg*, 170 F.3d at 17 (same). Likewise, Illinois courts have been reluctant to hold that the inequality in bargaining power alone suffices to invalidate an otherwise enforceable agreement. See, *e.g.*, *Streams Sports Club, Ltd. v. Richmond*, 99 Ill. 2d 182, 191 (1983) (holding that "disparity of bargaining power is not sufficient grounds to vitiate contractual obligations"); *Zobrist v. Verizon Wireless*, 354 Ill. App. 3d 1139 (2004) (same).

Finally, plaintiff argues that allowing for arbitration in this case contravenes the public policy behind our recognition of the cause of action of retaliation discharge based on our Workers' Compensation Act. She points to our decision in *Ryherd v. General Cable Co.*, 124 Ill. 2d 418 (1988), in which we stated that the right to recover for retaliatory discharge is derived from Illinois public policy and "cannot be negotiated or bargained away." *Ryherd*, 124 Ill. 2d at 426, citing *Gonzalez v. Prestress Engineering Corp.*, 115 Ill. 2d 1, 12 (1986). This statement, however, does not mean that an individual cannot agree to submit such claims to arbitration. We note that, in *Ryherd*, the court addressed the question of whether an employee's litigation of a retaliatory discharge claim was preempted by federal labor law because the employee previously arbitrated, under a labor contract, the question of whether he was discharged for "just cause." In holding that the claim was not preempted, the court found that a

"just cause" arbitration hearing could not substitute for a hearing on the question of whether the employee's common law right to be free from retaliatory discharge was violated. We point out that *Ryherd* did not involve the issue of the enforceability of an agreement to arbitrate a statutory claim nor does its holding preclude enforcement of the agreement to arbitrate in this case. Nothing in the Workers' Compensation Act or in our decisions concerning retaliatory discharge reveals an intent to preclude a waiver of a judicial forum for such claims. We note, as the appellate court did below, that "the notion that statutory rights cannot be arbitrated because arbitration is an inadequate forum for their vindication has, to a great extent, been eroded by a more favorable view of arbitration that has evolved under more recent cases." 352 Ill. App. 3d at 702. With respect to plaintiff's contention that retaliatory discharge claims further important social policies that cannot be achieved through arbitration, we share the views expressed by the United States Supreme Court in rejecting a similar argument advanced in the context of age discrimination claims made in the workplace:

> "We do not perceive any inherent inconsistency between those [social] policies, however, and enforcing agreements to arbitrate age discrimination claims. It is true that arbitration focuses on specific disputes between the parties involved. The same can be said, however, of judicial resolution of claims. Both of these dispute resolution mechanisms nevertheless also can further broader social purposes. The Sherman Act, the Securities Exchange Act of 1934, RICO, and the Securities Act of 1933 all are designed to advance important public policies, but, as noted above, claims under those statutes are appropriate for arbitration. '[S]o long as the prospective litigant effectively may vindicate [his or her] statutory cause of action in the arbitral forum, the statute will continue to serve both its remedial and deterrent function.' " *Gilmer*, 500 U.S. at 27-28, 114 L. Ed. 2d at 38, 111 S. Ct. at 1653, quoting *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 637, 87 L. Ed. 2d 444, 461-62, 105 S. Ct. 3346, 3359 (1985).

For these reasons, we do not believe *Ryherd* controls the resolution of this case in the manner plaintiff suggests.

We reaffirm that the public policy behind the Act, *i.e.*, providing for efficient and expeditious remedies for injured employees, would be undermined "if employers were permitted to abuse their power to terminate by threatening to discharge employees for seeking compensation under the Act." *Kelsay v. Motorola, Inc.*, 74 Ill. 2d 172, 182 (1978). We, however, fail to see how arbitration would contravene this public policy. As an initial matter, the Illinois General Assembly shares the same favorable view of arbitration as Congress, as evinced by its enactment of the Uniform Arbitration Act in 1961 (710 ILCS 5/1 *et seq.* (West 2000)). We have recognized that the "basic intention of our Arbitration Act is to discourage litigation and foster the voluntary resolution of disputes in a forum created, controlled and administered by the agreement to arbitrate ***." *Flood v. Country Mutual Insurance Co.*, 89 Ill. App. 2d 358, 364 (1967). Thus, the nature of arbitration alone is not enough for us to hold that its use in cases like this would contravene the public policy which drives retaliatory discharge claims based on the Workers' Compensation Act. We note that the agreement in this case does not limit the remedies available to plaintiff. Indeed, the agreement makes clear that the arbitrator is free to award any remedy recognized under the law. In this way, the instant agreement is fundamentally different from the agreement we refused to enforce in *Midgett v. Sackett-Chicago, Inc.*, 105 Ill. 2d 143 (1984). There, we found the agreement to arbitrate unenforceable because it precluded employees from receiving punitive damages. Damages, of course, serve as a tool for compensating victims of retaliatory discharge and as a deterrent to others to avoid such conduct. Because the arbitration agreement here does not cause plaintiff to forgo the full range of remedies available at law, we believe that arbitration can serve the same remedial and deterrent functions as litigation. See *Perez v. Globe Airport Security Services, Inc.*, 253 F.3d 1280, 1286 (11th Cir. 2001). We further note that courts have refused to enforce arbitration agreements where the arbitral costs borne by the employee were deemed to be so large and prohibitive so as to have the effect of precluding litigants from effectively vindicating their statutory rights. See *Morrison v. Circuit City Stores, Inc.*, 317 F.3d 646, 659 (6th Cir. 2003) (and cases cited therein). In this case, the agreement makes clear that the employer is to pay all costs, with the employee paying only a $125 fee. We do not believe such a fee would have the effect of precluding litigants from

effectively vindicating their rights under the Workers' Compensation Act. For these reasons, therefore, we do not believe compelling arbitration in this case would contravene the public policy surrounding retaliatory discharge claims based on the Workers' Compensation Act.

CONCLUSION

For the foregoing reasons, we find that the "Dispute Resolution Program" is an enforceable agreement between plaintiff and Anheuser-Busch. As such, we find that the circuit court erred in denying defendant's motion to dismiss and compel arbitration. We reverse the judgment of the appellate court and the order of the circuit court and remand the cause to the circuit court for further proceedings consonant with this opinion.

*Judgments reversed;*
*cause remanded.*

JUSTICE KILBRIDE, dissenting:

I respectfully dissent from the majority's opinion in this matter for a number of reasons. First, the majority has failed to support adequately the key component of the element of consideration in its contract analysis. Second, the majority's analysis fails to follow our longstanding precedent in *Ryherd* and conflicts with this state's strong public policy interest in protecting workers from retaliatory discharge. Third, the language of the employer's dispute resolution program policy statement and program guide (DRP) must be construed against the employer as its drafter. Finally, employer-mandated arbitration provisions are effectively contracts of adhesion and raise serious issues concerning employees' actual knowledge and voluntariness when being bound by them.

I

The majority states the plaintiff's continued employment with Anheuser-Busch provided the consideration needed for its contract analysis, citing *Duldulao v. Saint Mary of Nazareth Hospital Center*, 115 Ill. 2d 482 (1987). Slip op. at 13. In *Duldulao*, this court held that

˘18˘

changes in an employer's express disciplinary policy may create contractually enforceable rights in an employee if three conditions are met: (1) an adequately clear promise exists to create an employee's reasonable belief that an offer has been presented; (2) the distribution of the policy was performed in a way that ensured the employee was aware of it and reasonably believed an offer was made; and (3) the employee's acceptance is demonstrated by the commencement or continuation of work. *Duldulao*, 115 Ill. 2d at 490. In reaching this conclusion, *Duldulao* adopted the reasoning of the Minnesota Supreme Court in *Pine River State Bank v. Mettille*, 333 N.W.2d 622 (Minn. 1983). Notably, both *Duldulao* and *Pine River* focused on the enforceability of disciplinary policy changes affecting the treatment of employees during the course of their employment.

The *Duldulao* court considered an employee's right to the benefit of specific disciplinary procedures related to her employment that the employer had added to the employee handbook. Thus, the scope of the control exerted by the additional disciplinary provision in *Duldulao* extended only for the duration of the employment relationship. In contrast, the added dispute resolution provision here attempts to control the plaintiff's fundamental right to a jury trial *even after* the termination of the employment relationship. The new dispute resolution provision specifically required issues unable to be resolved by other measures to be decided by binding arbitration, waiving any right to a jury trial. *Duldulao* does not involve the validity of an agreement entered into during the course of employment that attempts to control the assertion of an employee's rights after termination of that employment. Therefore, *Duldulao* cannot support the extension of the provision's scope of control to conduct occurring after the termination of the employment relationship.

To fill the factual gap between *Duldulao* and this case, the majority broadly adds that "under Illinois law, continued employment is sufficient consideration for the enforcement of employment agreements," citing only nonprecedential appellate case law. See slip op. at 14, citing *Lawrence & Allen, Inc. v. Cambridge Human Resource Group, Inc.*, 292 Ill. App. 3d 131 (1997), *McRand, Inc. v. van Beelen*, 138 Ill. App. 3d 1045, 1055 (1985), and *Woodfield Group, Inc. v. DeLisle*, 295 Ill. App. 3d 935, 942-43 (1998). While these cases provide a somewhat more suitable framework for

˘19˘

analyzing the consideration in this case due to their consideration of the validity of employer-imposed provisions attempting to limit former employees' postemployment activities, they form an inadequate basis for summarily concluding there was sufficient consideration for the arbitration provision imposed in this case.

Initially, I note the same criticism the majority claims precludes the application of our longstanding precedent in *Ryherd* to this case also precludes the majority's reliance on its cited appellate cases. Just as "*Ryherd* did not involve the issue of the enforceability of an agreement to arbitrate a statutory claim" (slip op. at 15), here the cited appellate cases involve nonstatutory claims seeking to find postemployment restrictive covenants unenforceable. *Lawrence*, 292 Ill. App. 3d at 137; *McRand*, 138 Ill. App. 3d at 1047; *Woodfield*, 295 Ill. App. 3d at 936. If this court's own precedent in *Ryherd* is distinguishable on this basis, there can be no justification for relying on appellate court authority bearing the same "flaw." This is particularly true in this instance because even if the appellate court's cases were factually on point, they do not constitute binding authority on this court. *Department of Transportation ex rel. People v. 151 Interstate Road Corp.*, 209 Ill. 2d 471, 485 (2004).

In addition, although in *Lawrence*, 292 Ill. App. 3d at 138, and *McRand*, 138 Ill. App. 3d at 1055, the courts found that "continued employment for a substantial period" may provide sufficient consideration to support the restrictive employment covenants at issue there, they offer no real analysis of that issue. As the *McRand* court noted, our appellate court has either only "signaled" support for similar findings "[w]ithout discussing the issue at length" or enforced restrictive covenants imposed during an ongoing employment relationship without "directly addressing the issue of consideration." *McRand*, 138 Ill. App. 3d at 1055. Neither approach provides a satisfactory basis for the majority's reliance.

Despite this scant foundation, however, the majority unquestioningly adopts the appellate court's position. Indeed, it relies on that foundation to extend our prior holding in *Duldulao* outside the context of disputes arising during the course of an employment relationship. I believe the absence of any substantive discussion in the appellate cases merits, at a minimum, that this court undertake its own thorough examination of the issue prior to adopting a broader

rule. If we then determined the extension of *Duldulao* was justifiable under some set of circumstances, I would remand the cause to the trial court for a further review of the sufficiency of the consideration in this particular case. In light of the lack of any actual analysis of whether the plaintiff's continued employment constitutes sufficient consideration in the context of this case, however, I believe the majority's contract discussion is seriously undermined.


## II

The majority's analysis makes another critical error by ignoring this court's prior clear declaration that *employees may not negotiate or bargain away their right to seek recovery for retaliatory discharge* as derived from public policy. *Ryherd v. General Cable Co.*, 124 Ill. 2d 418, 426, 433 (1988). In *Ryherd*, this court held that even if an arbitrator had decided the underlying factual issues in a retaliatory discharge claim, the former employee could not be barred from filing a subsequent claim in state court. *Ryherd*, 124 Ill. 2d at 431, 434. We based this conclusion on the principle that "the arbitrator has no competence and, indeed, no mandate to determine whether the motives for the discharge contravene a clearly mandated public policy." *Ryherd*, 124 Ill. 2d at 431.

As in this case, the plaintiff in *Ryherd* alleged, in relevant part, that she was fired from her job in retaliation for filing a workers' compensation claim. See *Ryherd*, 124 Ill. 2d at 423. Thus, the rationale in *Ryherd* applies equally to this case. In *Ryherd*. this court soundly rejected the majority's approach permitting "the ultimate determination of Illinois public policy [to be] delegated to privately appointed arbitrators. The danger of such inconsistent and unreviewable private law militates against preemption." *Ryherd*, 124 Ill. 2d at 432. Under this established precedent, employers and employees may not contract away the authority to decide fundamental public policy questions to private arbitrators. Yet, that is exactly what the majority is permitting in this case.

In support, the majority cites with approval the United States Supreme Court's statement in *Gilmer v. Interstate/Johnson Lane Corp.* that " ' " [s]o long as the prospective litigant *effectively may vindicate [his or her] statutory cause of action in the arbitral forum*,

�’21�’

the statute will continue to serve both its remedial and deterrent function." ' " (Emphasis added.) Slip op. at 16, quoting *Gilmer*, 500 U.S. at 28, 114 L. Ed. 2d at 38, 111 S. Ct. at 1653, quoting *Mitsubishi*, 473 U.S. at 637, 87 L. Ed. 2d at 461-62, 105 S. Ct. at 3359. It fails to note, however, that the facts in this case show the dispute resolution procedures mandated in the arbitration provision provide far less procedural protection than is available for the vindication of the plaintiff's rights through a judicial forum.

Despite the purported availability of the same remedies in the arbitration proceedings mandated by the DRP and in court proceedings (slip op. at 17), the complainants enjoy significantly diminished procedural protections. For instance, according to the DRP policy statement the "legal rules of evidence" are inapplicable, with exceptions only for matters of "attorney-client privilege, attorney work product and compromise and offers to compromise." The arbitrator will not consider affidavits except by the written agreement of both parties. The use of depositions is also quite limited, permitting only the opposing party's expert witnesses and "up to two other individuals" to be deposed in the absence of an exception being granted by the arbitrator. Moreover, under the DRP complainants have only 21 days after the issuance of a written notice that mandatory nonbindiing mediation was unsuccessful to request a binding arbitration hearing or face the loss of their right even to receive an arbitration hearing. Thus, the arbitration proceedings do not provide the types of protections ordinarily extended in civil trials, a fact most, if not virtually all, employees fail to realize when they willingly or unwilling accept mandatory binding arbitration provisions in order to keep their jobs. Given these vital procedural distinctions, I do not believe the employer's program permits complainants to "effectively *** vindicate" their statutory rights. See *Gilmer*, 500 U.S. at 28, 114 L. Ed. 2d at 38, 111 S. Ct. at 1653. The arbitral forum offered by the program does not serve the deterrent and remedial functions of this state's workers' compensation statute.

### III

I also believe the language in the DRP policy statement is internally conflicting and should not be construed in favor of the employer. The policy statement defines the "covered employees" as

"all \*\*\* salaried and nonunion hourly employees of Anheuser-Busch Companies, Inc., or any of its U.S. subsidiaries." Thus, at the time this program was initiated, the plaintiff was considered a "covered employee." When her employment was terminated by Anheuser-Busch, however, she was no longer a salaried or nonunion hourly employee. Therefore, under the program's definition, she was no longer a "covered employee" subject to the terms of the DRP. Moreover, she was also not a "former employee" entitled to request application of the program because the policy statement specifically defines "former employees" as "[e]mployees terminated prior to the [dispute resolution program's] effective date." Applying this language here, the DRP was not applicable to the plaintiff as either a covered employee or as a former employee. Nonetheless, the DRP policy statement attempts to bind all involuntarily terminated employees by requiring use of the specified dispute resolution procedures for all disputes related to their terminations.

Employers cannot draft conflicting provisions requiring only salaried and nonunion hourly employees to participate in the dispute resolution program and at the same time also attempt to bind individuals who are no longer salaried or hourly employees by those same procedures. Under established principles of contract interpretation, such ambiguity must be construed against the employer as the drafter of the language. *Dowd & Dowd, Ltd. v. Gleason*, 181 Ill. 2d 460, 479 (1998). Applying that rule of construction in this case, the DRP is only applicable to disputes arising with current employees, not to past employees' allegations of retaliatory discharge. By their very nature, these claims arise after the termination of employment, when the individuals can no longer be considered "covered" by the dispute resolution program as salaried or hourly employees. Any other interpretation would undermine the strong support this court has previously demonstrated for the vital public interests underlying retaliatory discharge claims. See *Gonzalez v. Prestress Engineering Corp.*, 115 Ill. 2d 1, 9 (1986); *Kelsay v. Motorola, Inc.*, 74 Ill. 2d 172, 187 (1978).


IV

In addition, I am troubled by an employer's unilateral imposition of a mandatory binding arbitration provision requiring employees to

forfeit their constitutional rights to judicial process far in advance of any actual dispute. This places employees such as the plaintiff here in the fundamentally unfair position of being required to seek remedies exclusively in a forum mandated by employment agreements that can no longer logically bind them because they are no longer "covered employees." Furthermore, while there may be certain types of disputes that a given employee may be willing to submit to arbitration, there are undoubtedly other types that the same employee would choose to seek vindication of the employee's rights in a traditional judicial forum. By being economically coerced into signing a take-it-or-leave-it employer-mandated arbitration agreement just to maintain employment, the employee is often unwittingly stripped of the future ability to treat issues on a case-by-case basis. Moreover, as noted earlier in this dissent, nearly all employees lack sufficient knowledge of the differences in the procedural protections afforded to them in the two forums to make truly informed and voluntary decisions to enter into mandatory binding arbitration provisions. Common sense and experience dictate that, without that knowledge, employees accept the provisions solely in order to keep their current jobs.

Indeed, the true voluntariness of such an anticipatory employment agreement has been the subject of much criticism. See, *e.g.*, D. Schwartz, *Enforcing Small Print to Protect Big Business: Employee and Consumer Rights Claims in an Age of Compelled Arbitration*, 1997 Wis. L. Rev. 33, 76, 114-19 (1997) (noting that the drafters and proponents of the Federal Arbitration Act did not intend it to apply to contracts of adhesion such as employment contracts, that there is often a disparity of bargaining power and information between employers and employees pertaining to these agreements, and reviewing the critical differences between the use of settlements and prospective waivers such as predispute arbitration agreements); M. Eisenberg, *The Limits of Cognition and the Limits of Contract*, 47 Stan. L. Rev. 211, 251-52 (1995) (concluding that employees may be exploited by arbitration provisions due to their "limited cognition" of the longterm impact of their agreement to mandatory binding arbitration over disputes that have not yet even arisen); Comment, C. Reilly, *Achieving Knowing and Voluntary Consent in Pre-Dispute Mandatory Arbitration Agreements at the Contracting Stage of Employment*, 90 Cal. L. Rev. 1203, 1225-26, 1234-35 (2002) (citing

empirical studies showing that the majority of employees of all types are ignorant of their legal employment rights, the available legal processes, the procedural and remedial implications of agreeing to arbitration of future disputes, their substantive protections as employees, and that the economic pressures at work in these contracts of adhesion make truly knowing and voluntary consent unlikely).

I find these matters particularly troublesome in the context of the plaintiff's claims in this case. The plaintiff alleged she was discharged from her employment in retaliation for the exercise of her statutory rights under the Illinois workers' compensation statute. Without a doubt, retaliatory discharge is contrary to the public policy of this state. *Gonzalez v. Prestress Engineering Corp.*, 115 Ill. 2d 1, 9 (1986); *Kelsay v. Motorola, Inc.*, 74 Ill. 2d 172, 187 (1978).

This court has long recognized the vital importance of the public policy protecting employees who assert their rights under the Workers' Compensation Act. *Gonzalez*, 115 Ill. 2d at 9. In addition, the legislature's intent to protect employees' rights through third-party oversight is apparent from its statutory requirement of state approval prior to the settlement of certain types of workers' compensation claims. 820 ILCS 305/10.1 (West 2002). Here, the DPR deprives employees of the Act's third-party oversight protections by barring any state oversight. A refusal to recognize the serious question involving the voluntariness and the actual knowledge of employees about the ramifications of signing predispute arbitration clauses seriously undermines these intentions.

V

In sum, the majority's analysis is internally flawed, and its approach and outcome are in direct conflict with our prior decision in *Ryherd*. The opinion also ignores the real world factors militating against an employee's truly voluntary and knowing agreement to a mandatory binding arbitration provision imposed by an employer in a contract of adhesion. When viewed in light of this court's previous concerted efforts to uphold the strong public policy protecting employees who file Workers' Compensation Act claims, this analysis is particularly disconcerting. For these reasons, I respectfully dissent.