2023 IL App (4th) 230509

NOS. 4-23-0509, 4-23-0510, 4-23-0511

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
November 3, 2023
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* DAR. H., DAY. H., and DI. H., Minors | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Knox County |
| Petitioner-Appellee, | ) | Nos. 19JA1, |
| v. | ) | 19JA2, |
| Tosha B., | ) | 19JA21 |
| Respondent-Appellant). | ) | |
| | ) | Honorable |
| | | Curtis S. Lane, |
| | | Judge Presiding. |

JUSTICE STEIGMANN delivered the judgment of the court, with opinion.
Justices Harris and Lannerd concurred in the judgment and opinion.

**OPINION**

¶ 1        Respondent, Tosha B., is the mother of Dar. H. (born March 2007), Day. H. (born August 2009), and Di. H. (born March 2019). In April 2023, in proceedings involving all three children, the trial court found respondent was an unfit parent. In May 2023, the court found that termination of respondent's parental rights would be in the minor children's best interests.

¶ 2        Respondent appeals, arguing that the trial court's findings that respondent (1) failed to make reasonable efforts, (2) failed to make reasonable progress, (3) failed to maintain a reasonable degree of interest, and (4) exhibited habitual drunkenness or addiction to drugs in each case were against the manifest weight of the evidence. We disagree and affirm.

¶ 3                                I. BACKGROUND

¶ 4                        A. Procedural History Regarding Dar. H. and Day. H.

¶ 5        In January 2019, the State filed petitions for adjudication of wardship as to Dar. H. and Day. H., alleging the children were neglected in that they lived in an environment injurious to their welfare because in December 2018 an incident of domestic violence occurred between respondent and the children's father, Demond H., in the presence of Dar. H. See 705 ILCS 405/2-3(1)(b) (West 2018). The petitions further alleged that, as a result of that incident, Demond was arrested and ordered not to have any contact with respondent.

¶ 6        The petitions also alleged that three days later, Ashleigh Ruark, a social worker, "was assigned to a report regarding a domestic violence altercation between respondent *** and *** Demond." That same day, Ruark interviewed Demond, who was at the residence with respondent, and he indicated that he used cocaine, marijuana, and alcohol. See *id*. § 2-3(1)(b). At the time of those incidents, respondent was about five months pregnant with Di. H. (We note that Demond is not a party to this appeal.)

¶ 7        On the same day the petitions were filed, the trial court conducted a shelter care hearing and placed temporary custody of Dar. H. and Day. H. with the guardianship administrator of the Department of Children and Family Services (DCFS).

¶ 8        In March 2019, the trial court conducted an adjudicatory hearing regarding Dar. H. and Day. H. The court found that the children were neglected minors as alleged in the petition, noting that "the finding of abuse/neglect/dependence is based on the following facts: Domestic violence with child present. Mother['s] use of drugs (cocaine, cannabis, benzo) and prior indication." The court also orally admonished respondent that she "must cooperate with [DCFS], comply with the terms of the service plans, and correct the conditions that required the children to be in care or risk termination of [her] parental rights."

¶ 9        In April 2019, the trial court conducted a dispositional hearing regarding Dar. H.

and Day. H., at the conclusion of which it entered a written order finding (1) respondent unfit for reasons other than financial circumstances alone to care for, protect, train, educate, supervise, or discipline the minors and (2) it was in the best interests of the minors to be made wards of the court.

¶ 10                                B. Procedural History Regarding Di. H.

¶ 11            In May 2019, the State filed a petition for adjudication of wardship as to Di. H., alleging (1) the domestic violence incident between respondent and Demond, (2) Dar. H. and Day. H.'s being adjudicated neglected, (3) respondent's being found unfit to exercise custody or guardianship of Di. H.'s siblings the month prior, and (4) respondent's testing positive for cocaine, marijuana, and benzoylecgonine at Di. H.'s birth in January 2019 (see *id.* § 2-3). On the same day the petition was filed, the trial court conducted a shelter care hearing and placed temporary custody of Di. H. with the guardianship administrator of DCFS.

¶ 12            In July 2019, the trial court conducted both an adjudicatory hearing and dispositional hearing regarding Di. H. The court found that she was a neglected minor in that her environment was injurious to her welfare, writing, "The finding of abuse/neglect/dependence is based on the following facts: Domestic violence between parents, unfitness in 19 JA 01 + 19 JA 02 of both parents." The court also found (1) respondent unfit for reasons other than financial circumstances alone to care for, protect, train, educate, supervise, or discipline the Di. H. and (2) it was in the best interests of Di. H. to be made a ward of the court.

¶ 13                                C. The Termination Hearing

¶ 14            In January 2023, the State filed amended petitions to terminate respondent's parental rights as to each of the minor children. The State alleged respondent was an unfit parent within the meaning of the Adoption Act (750 ILCS 50/1 *et seq.* (West 2022)) because she failed

to (1) make reasonable efforts to correct the conditions that were the bases for the children's removal during the nine-month periods of (a) March 2019 to December 2019 and (b) July 2021 to April 2022, (2) make reasonable progress toward the return of the children within those same nine-month periods, and (3) maintain a reasonable degree of interest concern or responsibility as to the minor children's welfare. See *id.* § 1(D)(b), (m)(i)-(ii). In addition, the petition alleged that respondent had habitual drunkenness or addiction to drugs for at least one year immediately prior to the commencement of the unfitness proceeding. See *id.* § 1(D)(k).

¶ 15       In March, April, and May 2023, the trial court conducted bifurcated termination hearings on the State's petitions.

¶ 16                    1. *The Fitness Portion of the Termination Proceedings*

¶ 17                              a. Randall Aldridge

¶ 18       Randall Aldridge testified that he worked for the Center for Youth and Family Solutions (CYFS) and was the caseworker for the family from April 2019 through October 2019. Aldridge reviewed the case file and notes from prior case workers when he received the file.

¶ 19       Aldridge testified that the service plan for respondent required her to complete a substance abuse evaluation and recommended treatment; participate in drug drops and a mental health evaluation and recommended treatment; and cooperate with DCFS. Respondent completed substance abuse treatment and was successfully discharged from an inpatient treatment the month prior to Aldridge taking over the case. However, respondent later participated in only 2 of 11 drug drops, one of which she tested positive for alcohol, which, as Aldridge explained, was "one of the major issues that brought this case into care." Respondent was resistant to obtaining mental health therapy during Aldridge's time working with her, and respondent did not demonstrate forward progress with her mental health or substance abuse.

- 4 -

¶ 20       Respondent was also required to complete counseling directed at victims of domestic violence, which she completed in May 2019. However, she subsequently had another domestic violence incident with Demond in July 2019. Aldridge did not believe that respondent demonstrated progress related to domestic violence.

¶ 21                                          b. Alyssa Franqui

¶ 22       Alyssa Franqui testified that she worked for CYFS and was the caseworker for the family from October 2019 through May 2021.

¶ 23       Franqui testified that respondent's service plan required her to engage in mental health services, domestic violence services, substance abuse services, and parenting classes. Regarding substance abuse treatment, "there [were] certain periods of time whe[n] [respondent] was successful and then certain periods of time whe[n] she was unsuccessful." Franqui testified that at one point respondent was unsuccessful because she tested positive for methamphetamine and cocaine. Respondent also relapsed on alcohol in December 2019 during an overnight visit with Day. H., at which she was discovered "intoxicated and passed out." After that incident, Franqui directed respondent to engage in substance abuse services, "which [respondent] did end up engaging in after the fact." However, respondent had yet to follow through with that new substance abuse treatment by March 2020.

¶ 24                                          c. Cecily Dorsett

¶ 25       Cecily Dorsett testified that she worked for CYFS as the regional coordinator of child welfare and was involved in the family's case from July 2021 to April 2022.

¶ 26       Dorsett testified that respondent's service plan required her to complete domestic violence treatment, substance abuse treatment, and mental health treatment. Also, she was required to complete urine screens, cooperate with the agency, obtain proper housing, and

participate in visitation. In July 2021, Dorsett directed a caseworker to stop by respondent's residence for a "drop-in." When the caseworker arrived at the residence, she found all three of the children but not respondent present. Dorsett noted that there was not supposed to be an unsupervised visit between respondent and the children at that time and then had the children removed from the home.

¶ 27 Dorsett testified that respondent later explained to her that she was not present at the house because she had met up with a friend to have sex. She also claimed that she had left a babysitter for the children, but the children reported that was not true. Her children "reported that when she left she told them to lock the door and not let anyone else in the home because if [someone] came, they would be taken from her and she would kill herself if they were taken from her again." Following the incident, respondent did not visit the children consistently until September 2021, at which time she would often end visits early for reasons such as having plans or needing to check on dinner. "During that time frame, there were times where virtual visits were necessary ***. [S]he would frequently call-in other individuals. That—that was an issue that was addressed on a number of occasions."

¶ 28 Dorsett also testified that between July 2021 and April 2022, "[Respondent] was scheduled for 32 drug drops ***. She missed 18 of those. Eight of them were positive. All eight of those [were] positive for THC, one also positive for alcohol, and then there was one service denied and four negative [urine analyses] of those 32." In April 2022, Dar. H. reported to Dorsett that "[h]e'd been in a car with friends. He claimed that [respondent] was driving [another car] in the center lane, tried to run [Dar. H. and his friends] off the road and reported to staff that he felt she was intoxicated at the time, and he wanted us to know because he felt like her drinking had become a problem again at that point."

¶ 29    Dorsett also testified that respondent did have stable housing and employment while Dorsett was involved in the case.

¶ 30                                    d. Carolyn Hawes

¶ 31    Respondent called Carolyn Hawes as a witness. Hawes testified that she worked at CYFS and had been respondent's caseworker since April 2022. Since taking over as respondent's caseworker, Hawes had noticed a shift in respondent's behavior, explaining, "She has steadily been focusing more on her mental health and coping mechanism. She has engaged in therapy, substance abuse, NA [(Narcotics Anonymous)] and AA [(Alcoholics Anonymous)] meetings. She has attended group therapy. She has become employed full time." Further, respondent had engaged in substance abuse counseling and her housing was satisfactory. She also had visits with Day. H. and Di. H. that went well.

¶ 32    Regarding drug drops, from September 2022 to January 2023, respondent had not tested positive for drugs and did not miss any drops. In November 2022, respondent obtained a medical marijuana card. From April 2022 to September 2022, respondent was scheduled for 17 drug drops. However, she missed 5 of those drops.

¶ 33                                    e. Respondent

¶ 34    Respondent testified that that she had been engaged in counseling services since February 2021 and intended to continue with those services. In June 2023, she attended drug counseling but left early and followed up with outpatient treatment. She was also recently discharged unsuccessfully from Bridgeway because Bridgeway would not "honor" the medical marijuana program. Respondent, nonetheless, continued to use marijuana. Further, she was working and had housing.

¶ 35                            f. The Trial Court's Parental Fitness Findings

¶ 36 After hearing arguments from the parties, the trial court noted that it had heard evidence regarding (1) the March 2019 to December 2019 time period and (2) the July 2021 to April 2022 time period. Further, the court noted that the first time period was significant specifically to Dar. H. and Day. H.; the second time period was significant to Di. H.

¶ 37 Regarding the evidence, the trial court stated the following:

"The evidence produced during the first time period was that there was almost zero completion of any services. There was a domestic violence incident. There [were] missed drug drops. There were relapses. During the second time period, the mother's passage rate of drug drops [was] approximately 12.5 percent. They were either positive, missed, or invalid for some reason.

The—again, there were additional relapses. ***.

There was an incident in July of '21 where the mother had the children at her home and left them all alone, and that was at—basically at the beginning of the second time period.

***The—the—the reality here is that case numbers 19-JA-1 and 19-JA-2 technically commenced in January of 2019. That's over four years old. The other case, 19-JA-21, started in May of '19 and is approaching four years old.

And I don't disagree with [Demond's counsel]. It—you know, the State has elected to allow this to continue for a period of time, which I disagree with personally because of the—I've never quoted a prosecutor before, but [the prosecutor] stated, and I agree, the only consistency is the inconsistency in this case for the parents. They cannot keep it together. There are always problems. Always problems. They will do one thing but not the other. There are problems

with the visits. It—it—it—it does not stop regardless of the time periods.

The—the case as [respondent's counsel] stated correctly basically started because of Mom's alcohol and cocaine matters, but she has admitted during these times here of relapsing on alcohol."

¶ 38    The trial court concluded that the State had proven by clear and convincing evidence all four grounds for unfitness in the petition to terminate parental rights (see 750 ILCS 50/1(D)(b), (k), (m)(i), (ii) (West 2022)).

¶ 39    2. *The Best-Interest Portion of Termination Proceedings*

¶ 40    In May 2023, the trial court conducted a hearing on the best-interest portion of terminating proceedings, at the conclusion of which the court found that termination of respondent's parental rights was in the best interests of the children.

¶ 41    This appeal followed.

¶ 42    II. ANALYSIS

¶ 43    Respondent appeals, arguing that the trial court's findings that respondent (1) failed to make reasonable efforts, (2) failed to make reasonable progress, (3) failed to maintain a reasonable degree of interest, and (4) exhibited habitual drunkenness or addiction to drugs in each case were against the manifest weight of the evidence. We disagree and affirm.

¶ 44    A. Evidence Presented at Permanency Review Hearings Is Not Relevant to the Fitness-Portion of Termination Proceedings

¶ 45    As an initial matter, because respondent's brief relies entirely on evidence presented at permanency review hearings, we discuss the importance—or rather, *lack* of importance—of that evidence to the fitness portion of termination proceedings. Because evidence presented at hearings other than a fitness hearing, like permanency review hearings, is

generally not subject to the rules of evidence, a discussion in an appellant's brief of the evidence presented at a permanency review hearing, as well as any remarks of the trial court regarding that evidence, is a waste of both counsel's and this court's time.

¶ 46 We reiterate that a trial court's fitness findings made after it conducted a hearing on a petition to terminate parental rights are to be based solely on the evidence the court heard at the fitness hearing, *not* on any evidence that may have been presented at other hearings that preceded the fitness hearing.

¶ 47 This case is a prime example of what respondents should *not* argue in their briefs to this court. In the 22-page brief prepared by respondent's counsel on appeal in this case, *not one paragraph* discusses the evidence presented at the fitness hearing; instead, counsel discusses only evidence presented at earlier permanency review hearings and orders entered after those hearings. Counsel's sole argument on appeal is premised on alleged contradictions between the trial court's fitness findings and the court's earlier permanency review orders. However, that argument presupposes that the permanency review orders—and the evidence upon which those orders are based—hold some value in the trial court's fitness determination. We emphasize again *they do not*.

¶ 48 As we pointed out in in *In re M.D.*, 2022 IL App (4th) 210288, ¶ 72, 193 N.E.3d 933, the evidentiary rules governing permanency and dispositional hearings are far less strict than those of the fitness hearing:

> "At a permanency hearing, '[a]ll evidence relevant to determining [the legal issues set forth in section 2-28(2)], including oral and written reports, may be admitted and may be relied upon to the extent of their probative value.' [Citation.] Notably, '[i]f the permanency goal is return home, the court shall make

findings that identify *any problems* that are causing continued placement of the [child] away from the home and identify what outcomes would be considered a resolution to these problems.' (Emphasis added.) [Citation.] As this court has explained, a permanency hearing is essentially a continuation of the dispositional hearing, and—just as is the case with a dispositional hearing—there are no rules of evidence governing what the court may receive and consider at a permanency hearing."

On the other hand, fitness hearings are formal proceedings governed by the Illinois Rules of Evidence. *Id.* ¶ 75.

¶ 49 Because of the different evidentiary rules governing fitness hearings and permanency hearings, evidence and orders from permanency hearings may not be considered by a trial court at the fitness portion of the termination proceedings. *Id.* ¶ 81. Similarly, this court will not reverse a trial court's fitness findings based on evidence presented at the permanency hearings; instead, we review the trial court's findings based solely on evidence presented at the fitness hearing.

¶ 50 B. The Trial Court's Fitness Findings

¶ 51 It is well settled that "[b]ecause each of the statutory grounds of unfitness is independent, the trial court's finding may be affirmed where the evidence supports a finding of unfitness as to any one of the alleged grounds." *In re Adoption of P.J.H.*, 2019 IL App (5th) 190089, ¶ 11, 143 N.E.3d 805. Based on our review of the record, we conclude that the court's findings that respondent failed to make reasonable progress within the applicable nine-month periods were not against the manifest weight of the evidence. Accordingly, we discuss only those findings.

¶ 52                    1. *The Applicable Law and Standard of Review*

¶ 53          The State must prove unfitness as defined in section 1(D) of the Adoption Act

(750 ILCS 50/1(D) (West 2022)) by clear and convincing evidence. *In re N.G.*, 2018 IL 121939,

¶ 28, 115 N.E.3d 102. Section 1(D)(m)(ii) of the Adoption Act defines an unfit person as a

parent who fails to make "reasonable progress toward the return of the child" during any

nine-month period following an adjudication of neglect or abuse. 750 ILCS 50/1(D)(m)(ii) (West

2020). Reasonable progress is an objective review of the steps the parent has taken toward the

goal of reunification and examines the demonstrability and quality of those steps. *In re Ta. T.*,

2021 IL App (4th) 200658, ¶ 51, 187 N.E.3d 763. Reasonable progress exists when the trial court

can conclude that, in the near future, it will be able to order the children returned to parental

custody. *Id.*

¶ 54          A determination of parental unfitness involves factual findings and credibility

determinations that the trial court is in the best position to make. *In re M.I.*, 2016 IL 120232,

¶ 21, 77 N.E.3d 69. Accordingly, a trial court's finding of parental unfitness will not be reversed

unless it is against the manifest weight of the evidence. *N.G.*, 2018 IL 121939, ¶ 29. A decision

is against the manifest weight of the evidence when the opposite conclusion is clearly apparent.

*Id.*

¶ 55                            2. *This Case*

¶ 56                    a. March 2019 to December 2019

¶ 57          Aldridge testified that in 2019, while he was the caseworker, respondent was

directed to complete substance abuse and mental health classes, cooperate with the agency, and

complete a domestic violence program. The State concedes that the record superficially reflects

respondent's completion of those services but asserts her subsequent behavior showed that "she

did not learn from those services." The State contends that respondent's completion was merely performative. We agree with the State.

¶ 58          Aldridge testified that respondent missed 9 out of 11 drug drops and tested positive for alcohol during 1 of the 2 drug drops she attended. We note that Dar. H. and Day. H. were adjudicated neglected, in part, due to respondent's alcohol and drug use. Aldridge also testified that (1) respondent believed she did not need to complete therapy and (2) she was involved in a domestic violence incident in July 2019, which was another reason the children were removed from her custody. Although, respondent may have "completed" some of the services she was told to engage with, simply "showing up" is not enough to demonstrate reasonable progress under the Adoption Act. To the contrary, her demonstrated failure to incorporate what she learned from those services into her life establishes a distinct lack of progress toward returning her children safely to her care.

¶ 59          We reiterate the following passage we wrote in *Ta. T.*, 2021 IL App (4th) 200658, ¶ 56:

> "[T]here [is] a significant difference between going through the motions, checking off the boxes, and mechanically doing what is asked of the parent, and actually changing the circumstances that brought the children into care. The point of requiring parents to attend classes and engage in services is not just so the parents can say they attended; it is so parents *apply* what they learn in their lives, in the real world, such that the court can be confident that the children will be safe in their care." (Emphasis in original.).

¶ 60          Just as in *Ta. T.*, respondent here did not demonstrate that her progress was of such a quality that (1) the conditions that brought the children into care had been corrected and

(2) the children could be returned home safely. Accordingly, the trial court's fitness findings for the first nine-month period were not against the manifest weight of the evidence.

¶ 61                                             b. July 2021 to April 2022

¶ 62            Likewise, the record supports the trial court's finding that respondent failed to make reasonable progress during the second time period, between July 2021 and April 2022.

¶ 63            Dorsett testified that in July 2021, she directed a caseworker to stop by respondent's residence, who determined there was an unsupervised visit with all the children that was not supposed to occur. When the caseworker arrived, respondent was not present. Respondent then did not visit the children consistently until September 2021, at which time she would often end visits early for minor reasons. Further, between July 2021 and April 2022, "[respondent] was scheduled for 32 drug drops ***. She missed 18 of those. Eight of them were positive. All eight of those are positive for THC, one also positive for alcohol."

¶ 64            Again, drug and alcohol use were two of the reasons that Di. H. was removed from respondent's care. Respondent's failure to make meaningful changes during the nine-month period from July 2021 to April 2022 to correct the conditions that brought the Di. H. into care easily demonstrate a lack of progress. Accordingly, the trial court's fitness finding as to the second nine-month period was not against the manifest weight of the evidence.

¶ 65                                             III. CONCLUSION

¶ 66            For the reasons stated, we affirm the trial court's judgments.

¶ 67            Affirmed.

- 14 -

*In re Dar. H.*, 2023 IL App (4th) 230509

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Knox County, Nos. 19-JA-1, 19-JA-2, & 19-JA-21; the Hon. Curtis S. Lane, Judge, presiding. |
| **Attorneys for Appellant:** | Paul L. Mangieri of Barash & Everett, LLC, of Galesburg, for appellant. |
| **Attorneys for Appellee:** | Jeremy S. Karlin, State's Attorney, of Knox County  (Patrick Delfino, David J. Robinson, and Rosario David Escalera, Jr., of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |