**NOTICE**

This Order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2024 IL App (4th) 240200-U

NOS. 5-24-0200, 5-24-0202 cons.

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

**FILED**

August 6, 2024
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| RYAN J. MAHONEY, Individually and on Behalf of Cates Mahoney, LLC, | ) ) | Appeal from the Circuit Court of |
|     Plaintiff-Appellant and Cross-Appellee, | ) | Madison County |
|     v. | ) | No. 22LA1440 |
| DAVID I. CATES and THE CATES LAW FIRM, LLC, | ) ) | |
| | ) | Honorable |
|     Defendants-Appellees and Cross-Appellants. | ) ) | Sarah Danielle Smith, Judge Presiding. |

JUSTICE STEIGMANN delivered the judgment of the court.
Presiding Justice Cavanagh and Justice Lannerd concurred in the judgment.

**ORDER**

¶ 1 *Held:* The appellate court affirmed in part and reversed in part the judgment of the trial court because (1) the separation agreement was a distinct agreement that did not contain its own arbitration provision or incorporate the operating agreement's arbitration provision and (2) plaintiff's claims fell outside the scope of the arbitration provision.

¶ 2   In January 2013, plaintiff, Ryan Mahoney, and defendant, David Cates, formed the law firm Cates Mahoney, LLC ("Cates Mahoney" or "the firm"), and executed an operating agreement that would govern the firm's operations. In March 2022, Cates, as majority member, unilaterally dissolved Cates Mahoney, initiating a wind-up period for the firm. During that period, Mahoney and Cates negotiated a separation agreement, which they executed in August 2022.

¶ 3   Shortly after executing the separation agreement, Mahoney discovered that, prior to the execution of the separation agreement, Cates had mediated and settled two of the firm's cases, which generated approximately $9.5 million in fees. As a result, in November 2022,

Mahoney filed a five-count complaint, individually and on behalf of Cates Mahoney, against Cates and his new law firm, The Cates Law Firm, LLC, alleging breach of fiduciary duty and fraud during (1) the dissolution and wind-up of Cates Mahoney and (2) negotiation of the separation agreement, as well as breach of the separation agreement.

¶ 4 In January 2023, Cates filed a motion to dismiss and compel arbitration, arguing that the claims were subject to the arbitration provision contained in the operating agreement. Mahoney responded that the claims were not subject to arbitration because they arose from the separation agreement, which did not contain an arbitration provision. The trial court granted in part and denied in part Cates's motion, finding that two of the five claims were arbitrable while the remaining three claims were not.

¶ 5 Mahoney appeals, arguing that the trial court erred by finding any of the claims were arbitrable because (1) the express language of the operating agreement's arbitration provision limits the scope of that provision to claims that can be determined solely in accordance with the terms of the operating agreement, whereas Mahoney's claims require determination under the terms of the separation agreement, and (2) the separation agreement does not contain its own arbitration provision or incorporate, modify, or expand the arbitration provision in the operating agreement.

¶ 6 Cates cross-appeals, arguing that the trial court erred by finding any of the claims were *not* arbitrable because (1) the parties entered into a valid agreement to arbitrate any controversies arising out of or relating to the operating agreement and (2) the parties incorporated the arbitration provision into the separation agreement.

¶ 7 We agree with Mahoney that none of his claims were subject to arbitration and, accordingly, affirm in part and reverse in part the trial court's judgment.

¶ 8                                    I. BACKGROUND

¶ 9          At the outset, we note that this case originated in the Fifth District of the Illinois

Appellate Court but was assigned by the Illinois Supreme Court to this court for resolution.

¶ 10                                 A. The Complaint

¶ 11         In November 2022, Mahoney filed a five-count complaint against Cates asserting

claims of breach of fiduciary duty, fraud, and breach of contract arising from (1) the dissolution

and winding-up of Cates Mahoney and (2) the negotiation and execution of the parties' separation

agreement. The complaint specifically alleged the following.

¶ 12                 1. *Allegations Regarding the Founding of Cates Mahoney*

¶ 13         In January 2013, Mahoney and Cates founded the law firm of Cates Mahoney and

practiced law together pursuant to the firm's operating agreement. Cates was the managing

member and owned a 60% interest in the firm, whereas Mahoney owned a 40% interest in the firm.

¶ 14         Under the terms of the operating agreement, profits up to $400,000 would be split

50-50 between Cates and Mahoney, while profits over $400,000 would be split 60-40 between

Cates and Mahoney, respectively. The operating agreement also contained a provision for the

division of profits for cases resolved after dissolution, directing that the originating member would

receive one-third of the profits and the remaining two-thirds would be divided on a *quantum meruit*

basis in proportion to the work performed on the case by each member.

¶ 15         The operating agreement also provided that each member promised to "cooperate

in every regard in the winding up of the Firm affairs."

¶ 16                 2. *Allegations Concerning the* Blue Cross and Macia *Cases*

¶ 17         In October 2015, Cates Mahoney filed a complaint on behalf of a client in a case

identified as *Blue Cross*. In November 2020, Cates took a leave of absence from the firm, during

which time Mahoney "oversaw and ran all of [Cates Mahoney's] cases and operations, including *Blue Cross*." Mahoney spent substantial time litigating *Blue Cross*, including appearing in court, participating in phone conferences, and addressing discovery disputes. Even after Cates returned in January 2021, Mahoney continued to work on *Blue Cross*. In February 2021, the parties agreed to engage in mediation. Mahoney worked on the draft mediation statement, while Cates participated in the mediation. During the mediation, Cates provided Mahoney with updates of the parties' respective settlement positions. In November 2021, Mahoney stopped receiving correspondence or notices of the weekly calls in *Blue Cross*.

¶ 18 In 2014, Cates Mahoney (with co-counsel) filed a class action counterclaim in a case identified as *Macia*. In May 2022, the trial court in *Macia* entered a sanctions order assessing a $4000 per day sanction and awarding Cates Mahoney and its co-counsel reasonable costs and fees incurred in preparing and prosecuting five discovery motions. Later in May 2022, co-counsel e-mailed opposing counsel, copying Cates, stating that he was agreeable to participating in mediation under the condition that plaintiffs' counsel would not negotiate the sanctions award, which, at that time, totaled $676,000 and was still accruing. Cates failed to disclose to Mahoney (1) the e-mail, (2) the amount of the sanctions award, or (3) the fact that the firm remained entitled to the sanctions award.

¶ 19 On May 25, 2022, without Mahoney's knowledge, the *Blue Cross* parties conducted a second mediation, which did not appear on the firm's "joint calendar" or "daily reminder." Cates Mahoney maintained the joint calendar for all attorneys at the firm, and the daily reminder was an e-mail to all attorneys and staff listing the following day's calendared items. Cates participated in the mediation, at which the parties reached an agreement to settle *Blue Cross*. Cates never told Mahoney about the second mediation, including the agreement to settle *Blue Cross*.

- 4 -

¶ 20 On May 26, 2022, opposing counsel in *Macia* sent an e-mail to Cates Mahoney's co-counsel, copying Cates, that contained a settlement offer proposing that the defendants would pay "[$]1.5 million to the lawyers for fees/costs," including the "sanction issue." Opposing counsel also agreed that the defendants would pay for the costs associated with a second mediation, to be scheduled for June 20, 2022. Cates did not disclose to Mahoney the *Macia* settlement offer.

¶ 21 3. *Allegations Regarding the Dissolution and Winding-Up Period*

¶ 22 On May 27, 2022, Cates, as majority owner, unilaterally dissolved the Cates Mahoney law firm. Thereafter, Cates and Mahoney began negotiating a separation agreement. On May 31, 2022, Cates provided Mahoney with a list of all pending Cates Mahoney cases. The list "did not reveal the Mediation or agreement to settle *Blue Cross* or the pending *Macia* Sanctions Award."

¶ 23 On June 2, 2022, Cates and Mahoney met to review the firm's pending cases, including (1) the division of such cases, (2) cases that had settled or were close to settling, (3) anticipated funds pursuant to settlements, and (4) the distribution of Cates Mahoney funds. During that meeting, Cates did not disclose to Mahoney the mediation or agreement to settle *Blue Cross* or the *Macia* settlement proposal or sanctions award.

¶ 24 On June 20, 2022, Cates participated in an all-day mediation of *Macia*, which resulted in a settlement.

¶ 25 On June 23, 2022, without Mahoney's knowledge, Cates filed a motion in *Blue Cross* substituting his new firm, Cates Law, for Cates Mahoney. Around that same time, Mahoney asked Cates if *Macia* had settled at the June 20, 2022, mediation, and Cates responded that it had not.

¶ 26 On June 30, 2022, Mahoney asked Cates to provide the most recent settlement

proposal in *Macia*. Cates responded that he had nothing and was still "waiting on the defendants to send us a proposal." In that same communication, Mahoney asked if there were any other cases "where settlements are pending or agreed in principle." Cates again did not disclose the *Blue Cross* mediation and also did not include either *Blue Cross* or *Macia* among the cases with pending settlements. Cates also stated (1) "we do not have an agreement on the meaning of the term 'resolved' in the operating agreement" and (2) he "[did] not agree that any case that was 'settled' or 'settled in principle' prior to May 27 is considered 'resolved' under the [operating agreement]."

¶ 27    Also on June 30, 2022, Mahoney reviewed the *Blue Cross* file to confirm whether a settlement or settlement-in-principle had been reached. The file contained only documents relating to the February 2021 mediation and contained no mention of the May 2022 mediation.

¶ 28    On July 19, 2022, while still negotiating a separation agreement with Mahoney, Cates executed on behalf of his new firm, Cates Law, a settlement agreement in *Macia*, providing for approximately $4 million in fees to be paid to Cates Law and co-counsel.

¶ 29    On July 29, 2022, without Mahoney's knowledge, Cates executed on behalf of Cates Law the settlement agreement in *Blue Cross*, which stated, "At the conclusion of the [May 25, 2022,] mediation, the parties reached an agreement in principle to resolve [*Blue Cross*]."

¶ 30    On August 2, 2022, Cates filed a motion to approve the *Blue Cross* settlement, which requested, for Cates Law, approximately $7.45 million in attorney fees and costs and represented that plaintiffs' counsel, "including Cates Law" spent "nearly seven years" working on *Blue Cross*. The approval motion made no mention of Cates Mahoney even though Cates Law had been substituted into the case only six weeks earlier. On August 3, 2022, the motion for approval was granted.

¶ 31    4. *Allegations Regarding the Separation Agreement*

¶ 32          On August 19, 2022, Cates and Mahoney executed the separation agreement that they had been negotiating. At the time of the execution, Mahoney had no idea of (1) the *Blue Cross* mediation, (2) the settlements in *Blue Cross* and *Macia*, or (3) the sanctions award in *Macia*.

¶ 33          The separation agreement provided that "[the proceeds from] any case resolved prior to dissolution on May 27, 2022, are assets of [Cates Mahoney] and subject to fee sharing of the Members in accordance with [the operating agreement]." The separation agreement also defined "resolved" to mean "where a release or settlement agreement has been agreed to and/or signed by the parties and/or if court approval is required under the law and there are any legitimate objections to the approval, then after a court has approved the settlement."

¶ 34          Cates included *Blue Cross* on Schedule A of the separation agreement and warranted that "none of the cases identified in Schedule A of this Agreement had resolved prior to May 27, 2022."

¶ 35          On September 7, 2022, Mahoney received an e-mail from defense counsel in *Blue Cross* advising him to destroy all documents in his possession relating to *Blue Cross* pursuant to the trial court's "final judgment on August 3, 2022." The following day, Mahoney called defense counsel and learned that on August 3, 2022—two weeks before Cates and Mahoney signed the separation agreement—a final judgment in *Blue Cross* had been entered approving a settlement.

¶ 36          On September 12, 2022, Mahoney obtained from the courthouse copies of the *Blue Cross* and *Macia* filings that revealed the settlements in both matters, which generated a total of over $9.4 million in fees to Cates and Cates Law that had not been disclosed to Mahoney.

¶ 37          The complaint alleged that the foregoing acts constituted breach of fiduciary duty (counts I and II), constructive fraud (count III), actual fraud (count IV), and breach of the separation agreement (count V).

¶ 38    B. Cates's Motion To Dismiss and Compel Arbitration and Mahoney's Response

¶ 39    In January 2023, Cates filed a motion to dismiss and compel arbitration, arguing that Mahoney's claims were subject to an arbitration provision contained within the operating agreement. Cates asserted that the execution of the separation agreement did not change the agreement to arbitrate because the separation agreement "[did] not modify or amend any Article or Section of the Operating Agreement *** other than where specifically indicated," and the parties agreed that the Operating Agreement would "govern and control the Parties' rights and obligations with respect to dissolution of the Firm."

¶ 40    In March 2023, Mahoney filed a written response arguing that, by its express terms, the operating agreement's arbitration provision did not apply to the separation agreement. Specifically, Mahoney claimed that (1) in the operating agreement, the parties expressly limited arbitration to controversies that could be determined "*solely* in accordance with the terms of [the operating agreement]" and Illinois law governing limited liability corporations and (2) in the separation agreement, the parties expressly chose not to (a) include any arbitration provision or (b) modify or expand the scope of the operating agreement's arbitration provision to reach claims arising out of or relating to the separation agreement. Mahoney also pointed to a provision in the separation agreement providing that, in the event of a conflict between the operating agreement and the separation agreement, the terms of the separation agreement would prevail.

¶ 41    C. The Agreements

¶ 42    The parties attached copies of the operating agreement (executed January 1, 2013) and separation agreement (executed August 19, 2022) to their pleadings.

¶ 43    1. *The Operating Agreement*

¶ 44    The relevant portions of the operating agreement stated as follows:

"*Section 10.07 <u>Division of Attorney Fees for Cases Originated Prior to Dissolution, but Which are Resolved after Dissolution</u>*. For any cases originating prior to the dissolution of the Firm, but which are resolved after the dissolution of the Firm, the *Profits* (or *Shared Profits*) for such cases will be divided amongst the Members as follows:

***

For *New Cases* [(originating after January 1, 2013)]*:* The originating Member of the matter shall receive 33 1/3% of the *Profits*. The remaining 66 2/3% of the *Profits* shall be divided on a *quantum meruit* basis in proportion to the work performed by each Member on the case. In the event the originating Member cannot be discerned, and/or the case is defined as a *Firm Case* as set out in section 3.08, the *Profits* will be divided in accordance with Section 3.04(B)(1).

* * *

*Section 11.01 <u>Arbitration</u>.* Any controversy arising out of or relating to this Agreement [(the operating agreement)] shall be submitted to arbitration, and not any Court or other adjudicating body. The controversy shall be determined by the arbitrator solely in accordance with the terms of this Agreement, and Illinois law applicable to limited liability companies. The arbitrator is to strictly enforce the plain language of this Agreement."

¶ 45                                2. *The Separation Agreement*

¶ 46        The relevant portions of the separation agreement stated as follows:

"WHEREAS, Cates made a Resolution to dissolve the Firm, and dissolved the Firm on May 27, 2022 pursuant to the Operating Agreement for the Firm and

set the date for winding up the business for June 30, 2022; and

WHEREAS, the Parties desire to resolve their respective fee interests in all cases of the Firm; and

WHEREAS, this Agreement does not modify or amend any Article or Section of the Operating Agreement for the Firm other than where specifically indicated herein, and unless indicated otherwise, the Operating Agreement shall govern and control the Parties' rights and obligations with respect to dissolution of the Firm.

\* \* \*

4. *Quantum Meruit*. Cates and Mahoney waive any claim to *quantum meruit* in any of the cases retained by each Member of the Cates Mahoney law firm.

\* \* \*

8. Cases Included as Assets of Cates Mahoney, LLC for Dissolution. The fees and expense reimbursements for the cases identified in Schedule C to this Agreement shall be included in the funds available for distribution to the Members pursuant to Paragraph 11 [of the separation agreement]. The Parties acknowledge that any case resolved prior to dissolution on May 27, 2022 are assets of the Firm and subject to fee sharing of the Members in accordance with Article III of the Operating Agreement. This list was generated and created in reliance on the representations of each Member with respect to what cases had resolved prior to dissolution on May 27, 2022. [(In a footnote to this provision, the separation agreement defined the term "resolved" as set forth *supra* (¶ 33).]

- 10 -

9. <u>David Cates's Representations</u>. Cates represents and warrants that \*\*\* none of the cases identified in Schedule A of this Agreement had resolved prior to May 27, 2022. Cates further acknowledges that Mahoney has relied on said representations in entering into this Agreement and in accepting the payment amount estimated in Paragraph 11 below.

\* \* \*

16. <u>Governing Law</u>. This Agreement shall be construed and enforced in accordance with the laws of the State of Illinois.

17. <u>Severability</u>. Should any part, term or provision of this Agreement be declared and/or be determined by any court or arbitrator to be illegal or invalid, the validity of the remaining parts, terms or provisions shall not be affected thereby, and said illegal or invalid part, term or provision shall be deemed not to be a part of this Agreement.

\*\*\*

19. <u>Survival of Operating Agreement</u>. As to any conflicts between the terms of this Agreement and the Operating Agreement, the terms of this Agreement shall prevail. Except as herein specifically amended, the Operating Agreement for the Firm is affirmed and declared in full force."

¶ 47                                D. The Trial Court's Ruling

¶ 48      In March 2023, the trial court conducted a hearing on Cates's motion to dismiss and compel arbitration and, in January 2024, issued a written ruling granting that motion in part.

¶ 49      The trial court first addressed "whether the terms of the arbitration provision in the Operation Agreement apply to the subsequent Separation Agreement." The court reasoned that,

"While the Separation Agreement did not specifically mention the arbitration provision of the Operating Agreement, the Severability paragraph *** references determination of invalidity 'by any court or arbitrator' thereby seemingly acknowledging arbitration of the Separation Agreement by both parties." The court further found that the operating agreement and the separation agreement "both concern the same subject matter, i.e., the business of operating and dissolving the Cates Mahoney Law Firm." On these bases, the court concluded that "the arbitration provision covers the subsequent agreement."

¶ 50 The trial court next addressed whether "the controversies and claims at issue and raised in plaintiffs' complaint fall within the scope of the arbitration provision." The court found that the operating agreement "specifies various issues that would be arbitrable," particularly those related to the "Duty of a Member" provision of the operating agreement relating to (1) transferring firm assets and (2) tampering with information in client files. The court concluded that the allegations in counts I (breach of fiduciary duty) and V (breach of contract) were "arbitrable matters contemplated by the parties."

¶ 51 The trial court further found that the remaining allegations "relate to fraudulent allegations or fraudulent concealment," and as such "do not arise out of or are related to the operating agreement or the separation agreement." The court reasoned, "The operating agreement contained specific and detailed language as it relates to the Duty of a member during Dissolution. However, both agreements are silent as it relates to issues of fraud or fraudulent concealment." As a result, the court concluded that counts II (breach of fiduciary duty), III (constructive fraud), and IV (actual fraud) were not arbitrable.

¶ 52 This appeal followed.

¶ 53 II. ANALYSIS

¶ 54 Mahoney appeals, arguing that the trial court erred by finding any of the claims were arbitrable because (1) the arbitration clause by its express terms applied only to claims that could be determined solely in accordance with the terms of the operating agreement and (2) the separation agreement did not modify, expand, or incorporate by reference the operating agreement or its arbitration provision.

¶ 55 Cates cross-appeals, arguing that the trial court erred by finding any of the claims were *not* arbitrable because (1) the parties entered into a valid agreement to arbitrate any controversies arising out of or relating to the operating agreement and (2) the parties incorporated the arbitration provision into the separation agreement.

¶ 56 We agree with Mahoney that none of his claims were subject to arbitration and, accordingly, affirm in part and reverse in part the judgment of the trial court.

¶ 57                                    A. The Applicable Law

¶ 58 "A motion to compel arbitration is essentially a section 2-619(a)(9) [see 735 ILCS 5/2-619(a)(9) (West 2022))] motion to dismiss or stay an action in the trial court based on an affirmative matter, the exclusive remedy of arbitration." *Nord v. Residential Alternatives of Illinois*, 2023 IL App (4th) 220669, ¶ 28, __ N.E.3d __ (quoting *Sturgill v. Santander Consumer USA, Inc.*, 2016 IL App (5th) 140380, ¶ 21, 48 N.E.3d 759). "The party seeking to compel arbitration has the burden to establish that the parties have a valid agreement to arbitrate and that the controversy falls within the scope of the arbitration provision." *Sturgill*, 2016 IL App (5th) 140380, ¶ 22.

¶ 59 An agreement to arbitrate is a matter of contract. *Clanton v. Oakbrook Healthcare Centre, Ltd.*, 2023 IL 129067, ¶ 29, 226 N.E.3d 1266. "The parties to an agreement are bound to arbitrate only those issues which by clear language and their intentions expressed in the language

show they have agreed to arbitrate." *Id.* ¶ 29. "In the absence of an ambiguity, the intention of the parties at the time the contract was entered into must be ascertained by the language used in the contract itself, not by the construction placed upon it by the parties." *Id.* ¶ 30. "Arbitration agreements cannot be extended by construction or implication." *Id.* ¶ 29.

¶ 60　　　　　Review of an order granting or denying a motion to compel arbitration, when no evidentiary hearing was conducted, is *de novo*. *Clanton*, 2023 IL 129067, ¶ 31. When ruling on a motion to dismiss and compel arbitration pursuant to section 2-619, the court must interpret all pleadings and supporting documents in the light most favorable to the nonmoving party. *Melena v. Anheuser-Busch, Inc.*, 219 Ill. 2d 135, 141, 847 N.E.2d 99, 103 (2006).

¶ 61　　　　　　　　　　　　B. This Case

¶ 62　　　　　　　　1. *The Arbitration Provision in the Operating Agreement*

*Was Not Incorporated Into the Separation Agreement*

¶ 63　　　　　Here, citing *Nagle v. Nadelhoffer, Nagle, Kuhn, Mitchell, Moss and Saloga, P.C.*, 244 Ill. App. 3d 920, 928, 613 N.E.2d 331, 336 (1993), the trial court concluded that the arbitration provision in the operating agreement applied to the separation agreement because "both [agreements] concern the same subject matter, *i.e.*, the business of operating and dissolving the Cates Mahoney Law Firm." The court also pointed to the language in the severability clause of the separation agreement that stated if "a court or arbitrator" found any provision invalid, that provision could be severed as support for the court's conclusion that the parties contemplated arbitration of disputes arising from the separation agreement.

¶ 64　　　　　Mahoney argues that the trial court erred by (1) applying *Nagle* and (2) reasoning that the mention of an arbitrator in the severability clause amounts to an agreement to arbitrate the separation agreement. Mahoney further argues that the arbitration provision in the operating

agreement does not apply to the separation agreement because the separation agreement is a separate contract that did not (1) incorporate the operating agreement or arbitration provision by reference or (2) expand or modify the operating agreement.

¶ 65        Cates responds that the parties did incorporate the arbitration provision into the separation agreement by including language in that agreement that the parties (1) agreed that the operating agreement would "govern and control the Parties' rights and obligations with respect to the dissolution of the Firm" and (2) declared the operating agreement "affirmed" and in "full force."

¶ 66                          a. *Nagle* Is Inapposite

¶ 67        First, we agree with Mahoney that the trial court erred by relying on *Nagle* because *Nagle* is factually distinguishable. *Nagle* involved what is termed a "generic arbitration clause." *Nagle*, 244 Ill. App. 3d at 925. A "generic arbitration clause" is one that "provides that all claims 'arising out of or relating to' the agreement shall be settled in arbitration." *Id.* (citing *Johnson v. Baumgardt*, 216 Ill. App. 3d 550, 558, 576 N.E.2d 515 (1991)). The arbitration clause in *Nagle* was contained in an employment agreement and stated that "Any controversy or claim arising out of, or relating to this Agreement, or the breach thereof, shall be settled by arbitration."

¶ 68        Unlike *Nagle*, the present case does not involve a generic arbitration clause. Although the arbitration provision in the operating agreement contains the "arising out of or relating to" language addressed in *Nagle*, it further states that controversies shall be determined "solely in accordance with the terms of [the operating agreement]." The latter language has the effect of limiting the scope of the arbitration provision to those controversies arising from or relating to the operating agreement that can be determined solely in accordance with the terms of the operating agreement. As we explain in greater detail (*infra* ¶¶ 83-92), although Mahoney's

claims *relate to* the operating agreement, they cannot be determined without considering the terms of the separation agreement, as well.

¶ 69      Because *Nagle* involved a generic arbitration clause while the present case involved an arbitration clause with express limiting language, *Nagle* is inapposite. (Additionally, we note that the *Nagle* court did not hold that the arbitration clause in the employment agreement also applied to the subsequent stock redemption agreement between the parties, instead reserving that question for an arbitrator because the record was unclear. *Nagle*, 244 Ill. App. 3d at 929-30.)

¶ 70                    b. The Language of the Separation Agreement

¶ 71      Because "[t]he parties to an agreement are bound to arbitrate only those issues which by clear language and their intentions expressed in the language show they have agreed to arbitrate," our determination of whether the separation agreement incorporates the arbitration provision in the operating agreement turns on the language of the separation agreement, which we interpret using ordinary contract principles. *Clanton*, 2023 IL 129067, ¶ 30. "[A] contract must be construed as a whole, viewing each provision in light of the other provisions." *Thompson v. Gordon*, 241 Ill. 2d 428, 441, 948 N.E.2d 39, 47 (2011). "The parties' intent is not determined by viewing a clause or provision in isolation, or in looking at detached portions of the contract." *Thompson*, 241 Ill. 2d at 441.

¶ 72      The relevant provisions of the separation agreement read as follows:

> "WHEREAS, this Agreement does not modify or amend any Article or Section of the Operating Agreement of the Firm other than where specifically indicated herein, and unless indicated otherwise, the Operating Agreement shall govern and control the Parties' rights and obligations with respect to dissolution of the Firm.

* * *

16. <u>Governing Law</u>. This Agreement shall be construed and enforced in accordance with the laws of the State of Illinois.

* * *

19. <u>Survival of Operating Agreement</u>. As to any conflicts between the terms of this Agreement and the Operating Agreement, the terms of this Agreement shall prevail. Except as herein specifically amended, the Operating Agreement for the Firm is affirmed and declared in full force."

¶ 73    In support of Cates's argument that the separation agreement incorporates the operating agreement, including its arbitration provision, he points to the language in the separation agreement (1) providing that the operating agreement would "govern and control the Parties' rights and obligations with respect to dissolution of the Firm" and (2) declaring the operating agreement "affirmed" and "in full force."

¶ 74    Mahoney, on the other hand, contends that the absence of language (1) incorporating the arbitration provision or operating agreement by reference or (2) modifying or expanding the scope of the arbitration provision to apply to the separation agreement undermines Cate's contention that the arbitration provision applied to the separation agreement.

¶ 75    Reading the relevant provisions as a whole, Cates has not demonstrated that the parties incorporated the operating agreement or its arbitration provision into the separation agreement. To the contrary, when read as a whole, the above provisions demonstrate that the operating agreement and separation agreement are two distinct agreements. Specifically, the separation agreement states that it (1) does not modify or amend the operating agreement and (2) controls in the event of any conflict. These statements are a clear indication that the separation

agreement is a separate contract. If the separation agreement was not its own distinct contract, it would not need to (1) declare that the operating agreement remains in effect or (2) repeat the same choice of law provision contained in the operating agreement. See *Evans v. Lima Lima Flight Team, Inc.*, 373 Ill. App. 3d 407, 413, 869 N.E.2d 195, 201 (2007) ("Contractual terms should be construed so as to avoid the conclusion that other terms are redundant.").

¶ 76        Equally important to our analysis is what the separation agreement does *not* state. The separation agreement does not include its own arbitration provision. Instead, the parties included a choice of law provision stating that the separation agreement would be governed by the laws of the State of Illinois. And the separation agreement does not state that it incorporates the operating agreement or its arbitration provision by reference. Had the parties intended to arbitrate disputes arising from or relating to the separation agreement, they could have easily included an express arbitration provision or express incorporation by reference of the operating agreement or its arbitration provision.

¶ 77        It is well established that "[a]rbitration agreements cannot be extended by construction or implication." *Clanton*, 2023 IL 129067, ¶ 29. As Mahoney argued before the trial court, "Everybody in this building [(the courthouse)] knows how to incorporate something by reference." We wholeheartedly agree and emphasize the point. The absence of an express incorporation provision in a contract executed by two experienced attorneys is significant, and we decline to infer an incorporation by reference where none exists.

¶ 78        For the same reason, we conclude that the trial court erred by ruling that the mention of a "court or arbitrator" in the severability clause constitutes an agreement to arbitrate. The court's reasoning serves as a prime example of what Illinois law prohibits—extending an arbitration clause by construction or implication. *Clanton*, 2023 IL 129067, ¶ 29. The mention of an arbitrator in the

severability clause falls far short of constituting an express agreement to arbitrate. We agree with Mahoney that the reference to an arbitrator simply acknowledges the possibility that the parties, in the future, might agree, independent of any contractual obligation, to arbitrate a dispute arising under the separation agreement.

¶ 79　　　　We also agree with Mahoney that the separation agreement does not modify the operating agreement to expand the scope of its arbitration provision to cover disputes relating to the separation agreement. Indeed, the separation agreement explicitly states that it does *not* modify or amend the operating agreement *at all* except where expressly stated. The separation agreement did not state anything about arbitration, much less expressly modify the arbitration provision in the operating agreement. This shows an intent to *not* expand the scope of the arbitration agreement to apply to the separation agreement.

¶ 80　　　　As we have discussed, the express language of the arbitration provision limits its scope to those controversies that can be determined solely in accordance with the terms of the operating agreement. Because that limitation was not modified or expanded to include controversies that can be determined in accordance with the terms of both the operating agreement and separation agreement, the arbitration provision does not apply to the separation agreement.

¶ 81　　　　For these reasons, the trial court erred by ruling that the arbitration provision in the operating agreement applied to the separation agreement. We conclude that the separation agreement is a distinct agreement that does not (1) contain its own arbitration agreement or (2) incorporate by reference or modify or amend the arbitration provision in the operating agreement to extend to the separation agreement.

¶ 82　　　　2. *Mahoney's Claims Fall Outside the Scope of the Arbitration Provision*

*in the Operating Agreement*

¶ 83    Mahoney also argues that his claims fall outside the scope of the arbitration provision of the operating agreement because the express language of the arbitration provision limits its application to disputes that can be determined solely in accordance with the terms of the operating agreement. Mahoney's claims, he contends, must be determined, at least in part, in accordance with the separation agreement, which, as we have determined, is a separate agreement.

¶ 84    Cates argues that all of Mahoney's claims are arbitrable because the parties agreed to arbitrate any controversies that "arise out of or relate to" the operating agreement. Cates asserts that, without the operating agreement, Cates would owe no fiduciary duties to Mahoney, which duties form a necessary part of each claim.

¶ 85    Although Cates is correct that the arbitration provision is broad and applies to all disputes that "arise out of or relate to" the operating agreement, his argument ignores the limiting language that immediately follows the generic phrase he relies upon. That language explicitly narrows the scope of the arbitration provision to disputes that can be determined "solely in accordance with the terms of the operating agreement."

¶ 86    Cates contends that the "solely in accordance with" phrase is simply a direction to the arbitrator concerning how the arbitrator is to resolve claims. Cates's argument is unpersuasive because regardless of how the phrase is characterized, we must still give it effect when construing the scope of the arbitration provision because it is express language that the parties chose to include in their contract. We agree with Mahoney that to accept Cates's interpretation would require this court to ignore the contractual language directing that controversies be determined solely in accordance with the terms of the operating agreement. See *Thompson*, 241 Ill. 2d at 442. ("A court will not interpret a contract in a manner that would nullify or render provisions meaningless, or in a way that is contrary to the plain and obvious meaning of the language used."); see also *Wood v.*

*Evergreen Condominium Ass'n*, 2021 IL App (1st) 200687, ¶ 51, 189 N.E.3d 1045 ("[W]hen interpreting a contract, we must give effect to all of the contract's provisions if it is possible to do so.").

¶ 87 Here, the resolution of each of Mahoney's claims requires application of the terms of both the operating agreement *and* the settlement agreement. For example, each of Mahoney's claims alleges that Cates concealed from him the *Blue Cross* settlement, depriving Mahoney of his rightful share of the approximate $7.45 million in fees. The express purpose of the separation agreement was for the parties to "resolve their respective fee interests in all cases of the Firm." To determine whether Cates acted wrongfully and what amount, if any, of the *Blue Cross* fees Mahoney was entitled to, an arbitrator would have to look to both the operating agreement and the separation agreement.

¶ 88 If applying only the terms of the operating agreement, the *Blue Cross* settlement would appear to fall under section 10.07 as a case originated prior to dissolution but resolved after dissolution. Under the terms of section 10.07, the originating member would receive 33 1/3% of the profits and the remaining 66 2/3% would be divided on a *quantum meruit* basis.

¶ 89 However, whether *Blue Cross* was resolved before or after dissolution is a material question in this case—one that can only be determined by applying the definition of "resolved" in the separation agreement. Mahoney alleged that the *Blue Cross* parties reached a settlement agreement at the May 25, 2022, mediation. Yet, Cates warranted in the separation agreement that *Blue Cross* was *not* resolved prior to dissolution, including it among his own "retained cases" listed in Schedule A.

¶ 90 Pursuant to the separation agreement, Mahoney would receive (1) 1/3 of the profits of Schedule A cases if he was the originating member, but waive his claim to any costs, or (2) "in

lieu of the requirements of Section 10.07 of the Operating Agreement," none of the profits of Schedule A cases if the case was a "firm case" as defined in the operating agreement (as any case where the originating member could not be discerned or that was obtained through the joint efforts of the members). As to those Schedule A firm cases, the parties agreed that they had "reviewed the estimated values" of those cases and waived any right they might have to a fee or costs. In either case—whether a Mahoney-originated case or a firm case—under the separation agreement, Mahoney waived his right to *quantum meruit*.

¶ 91　　　　As the foregoing demonstrates, an arbitrator would have to apply the terms of both the operating agreement and separation agreement to determine whether and in what amount Mahoney was damaged. If the arbitrator applied only the terms of the operating agreement, his or her damages calculation would be wrong.

¶ 92　　　　We note in particular that the trial court found that counts I (breach of fiduciary duty) and count V (breach of contract) were arbitrable because they "related to" subparagraphs 8(a), (c), (e), and (g) of the complaint—namely, Mahoney's allegations that Cates (1) concealed from Mahoney and omitted or removed from Cates Mahoney files any reference to the mediation and settlement of *Blue Cross*, (2) substituted Cates Law as counsel in *Blue Cross* without Mahoney's knowledge, (3) appropriated for himself the $7.5 million fee from *Blue Cross*, and (4) appropriated for himself and Cates Law the entirety of the $2 million fee and expense award in *Macia*. The trial court is correct that these counts "relate to" those subparagraphs, but as we have explained that is not where the analysis ends because whether Mahoney was damaged and the extent to which he was damaged requires consideration of the terms of the separation agreement as well as the operating agreement. Moreover, count V explicitly alleges breach of the separation agreement. It would be impossible for an arbitrator to determine whether that agreement

has been breached without considering its terms.

¶ 93　　　In closing, we reiterate that Cates, as the party seeking to compel arbitration, bears the burden of demonstrating that (1) the parties entered into a valid agreement to arbitrate and (2) the claims at issue fall within the scope of that agreement. *Sturgill*, 2016 IL App (5th) 140380, ¶ 22. Moreover, we construe the pleadings and supporting documents in the light most favorable to Mahoney as the nonmoving party. *Melena*, 219 Ill. 2d at 141. Applying these principles, because Cates's arguments require us to (1) infer an agreement to arbitrate where none was expressly stated or (2) ignore express contractual language, Cates has failed to meet his burden.

¶ 94　　　For these reasons, we conclude that the trial court erred by determining that counts I and V fell within the scope of the arbitration provision of the operating agreement, and we reverse the court's judgment as to those counts. We affirm the court's finding that counts II, III, and IV fell outside the scope of the arbitration agreement, albeit for different reasons explained herein, and we affirm the court's judgment as to those counts.

¶ 95　　　Although we have disagreed in part with the trial court's legal conclusion, we wish to thank the court for its thoughtful and detailed written order that (1) thoroughly and succinctly explained the background of this complicated dispute and (2) set forth in clear detail the court's analysis.

¶ 96　　　　　　　　　　　　　III. CONCLUSION

¶ 97　　　For the reasons stated, we conclude that none of Mahoney's claims were subject to arbitration. Accordingly, we (1) reverse the trial court's judgment with respect to counts I and V and (2) affirm the court's judgment with respect to counts II, III, and IV.

¶ 98　　　Affirmed in part and reversed in part.